CHISHOLM & CO., and James Henry Chisholm, Plaintiffs,

v.

BANK OF JAMAICA, a foreign banking institution, and Horace George Barber, Defendants.

No. 85-3656-CIV.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 5, 1986.

As Amended on Motion for Reconsideration
Oct. 22, 1986

Gregory P. Borgognoni, of Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Miami, Fla., for plaintiffs.

R. Thomas Farrar, of Holland & Knight, Miami, Fla., for defendants.

## ORDER DISMISSING CERTAIN COUNTS IN THE COMPLAINT AND REQUIRING PARTIES TO SUBMIT A SCHEDULING REPORT

EDWARD B. DAVIS, District Judge.

THIS MATTER is before the Court on Defendants' Motion to Dismiss the Complaint on various grounds. Plaintiffs CHISHOLM & CO. and JAMES HENRY CHISHOLM brought this action in federal court for quantum meruit and other relief against Defendants BANK OF JAMAICA ("BANK") and its former Governor, HORACE GEORGE BARBER. Plaintiffs provided services to Defendants in obtaining lines of credit to finance the export of U.S. products. In an eight-count Complaint, Plaintiffs essentially claim that Defendants have failed to pay commissions for those services, and that Defendants have interfered with CHISHOLM & CO.'s relationship with the Export-Import Bank of the United States ("Eximbank") and with the Small Business Association of Jamaica ("SBA"). Defendants now claim their actions are protected by sovereign immunity, since the Defendant BANK is wholly-owned by the government of Jamaica. The BANK also claims its actions were acts of state, that the United States is an inconvenient forum, and that the individual counts are, as a matter of law, meritless.

## I. Facts[1]

Plaintiff CHISHOLM & CO. is a Florida corporation. Plaintiff JAMES HENRY CHISHOLM is a resident of Florida, but a citizen of Jamaica. CHISHOLM & CO. is an approved participant in the Credit Insurance Program of Eximbank. By written agreement with Eximbank, CHISHOLM & CO. is authorized to apply for special buyer credit insurance on behalf of foreign importer that wants to finance imports from the United States.

In January of 1982, the BANK and CHISHOLM & CO. agreed that CHISHOLM & CO. would arrange lines of credit from various banks and procure Eximbank insurance for the BANK to be available for the aid of Jamaican importers. CHISHOLM & CO. then negotiated and arranged for $50 million of credit insurance from Eximbank and lines of credit from Florida National Bank, Bankers Trust Company, and Irving Trust Company. CHISHOLM & CO. also arranged meetings between the BANK and the American banks, and took the president of Florida National Bank to Jamaica to meet with BANK officials.

While this was happening, and unbeknownst to CHISHOLM & CO., the BANK was dealing directly with Eximbank. BARBER instructed Eximbank to exclude CHISHOLM & CO. from the Jamaica program, and requested that the $50 million of credit insurance for which CHISHOLM & CO. had applied be issued solely in the name of the BANK and the Jamaican Export Credit Insurance Corporation ("JECIC"), a subsidiary of the BANK. As a result, CHISHOLM & CO.'s Eximbank insurance application was withdrawn from consideration. BARBER included other companies in the program, however, and paid commissions to them for obtaining lines of credit, while refusing to accept CHISHOLM & CO.'s offers of credit at lower rates. The BANK also refused to permit the SBA to negotiate its lines of credit through CHISHOLM & CO. Nevertheless, the BANK continued to express its

---

1. Since this is a Motion to Dismiss, the facts in the Complaint must be taken as true. *See, e.g., Hepperle v. Johnston,* 544 F.2d 201 (5th Cir. 1976). Both parties have also filed affidavits. The Court may consider them without interpreting the motion as one for summary judgment, but only as they relate to the issues of jurisdiction and sovereign immunity. *See Jet Line Services, Inc. v. M/V Marsa El Hariga,* 462 F.Supp. 1165 (D.Md.1978).

interest to CHISHOLM & CO. in doing business, and asked CHISHOLM & CO. to continue working on its pending credit proposals.

## II. Discussion of Law

### A. Sovereign Immunity

■ Defendants claim that their actions are protected by sovereign immunity. Such claims are now controlled by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. Sections 1602–1611 (1976), which grants foreign states immunity from suit in federal and state court, subject to certain exceptions.[2] Before the FSIA, decisions about sovereign immunity were made on an *ad hoc* basis by the courts with the advice of the executive branch. The statute was enacted "to free the Government from the case-by case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that … decisions are made on purely legal grounds and under pressures that insure due process.'" FSIA H.Rep. No. 94–1487, 94th Cong., 2d Sess. 16, *reprinted in* [1976] U.S.Code Cong. & Admin.News 1976, p. 6604, 6606 ("House Report"), *quoted in Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983).

■ The FSIA is both jurisdictional and substantive in nature, in that it governs the availability of sovereign immunity as a defense and both subject matter and personal jurisdiction over foreign state defendants. 28 U.S.C. Section 1330(a) grants federal courts subject matter jurisdiction over foreign state defendants in cases where they are not entitled to immunity under Sections 1605–1607. Under Section 1330(b), personal jurisdiction exists where subject matter jurisdiction exists and service of process is made in accordance with the FSIA requirements.[3]

Under Section 1604 of the FSIA, foreign states and their agencies and instrumentalities are generally immune from suit in United States courts. 28 U.S.C. Section 1603(a). Neither party disputes that the Bank of Jamaica, wholly-owned by the government of Jamaica, is included within this definition.

■ Plaintiffs contend, however, that the Defendants' activity falls within the exception to sovereign immunity outlined in Section 1605, the "commercial activity" exception. Section 1605(a)(2) strips foreign countries of their sovereign immunity in any case—

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with the commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with the commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Thus, the Section requires, in order for United States courts to obtain subject matter jurisdiction over the activities of foreign sovereigns, that their activity be in some sense commercial and that they be related to the United States in one of three possible ways.

### 1. Commercial Activity

■■ The FSIA itself offers little guidance in determining whether a sovereign's conduct is commercial. Congress, in enacting the FSIA, decided to give the federal courts "a great deal of latitude" in this area. *House Report,* at 6615. In analyzing whether the particular conduct at issue

---

2. The FSIA has been said to present "a peculiarly twisted exercise in statutory draftmanship." *See Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne de Navigation,* 730 F.2d 195, 205 (5th Cir.1984) (Higginbotham, J., concurring and dissenting). As a result, the case law interpreting it has tended to be equally obtuse.

3. Although under the FSIA subject matter and personal jurisdiction are virtually merged, courts must still inquire whether the exercise of personal jurisdiction comports with due process. *See, e.g., Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 313–315 (2d Cir.1981).

is commercial, the Court must therefore look to the Act's legislative history, cases interpreting the Act, and its own common sense. "The focus ... is not on whether the Defendant generally engages in a commercial enterprise or activity ...; rather, it is on whether the particular conduct giving rise to the claim in question constitutes or is in connection with commercial activity, regardless of the Defendant's generally commercial or governmental character." *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1379–80 (5th Cir. 1980). Thus, a foreign state may be immune for some of its acts, which are purely governmental, while not being immune for other, commercial acts. *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 855 (S.D.N.Y.1978).

In this case, there are three different types of relevant activity in which the BANK was engaged, and the Court must determine whether these independent activities were commercial or governmental. First of these is the BANK's negotiations and communications with Plaintiffs (Counts I, IV, V, and VII); second, the BANK's communications with Eximbank (Counts II, VI, and VII); and third, its prohibiting the SBA from dealing with Plaintiff and its approval of the other companies as means of obtaining credit (Counts III, VI, and VIII).

Section 1603(d) elusively defines commercial activity as:

> ... either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose.*

(emphasis added). The legislative history of the FSIA suggests that the drafters intended to cover contracts for lines of credit. They mention as examples of commercial activity

> import-export transactions involving sales to or purchases from concerns in the United States, business torts occurring in the United States, ... and *an indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States, or which receives financing from a private or public lending institution located in the United States—for example, loans, guarantees or insurance provided by the Export-Import Bank of the United States.*

*House Report* at p. 6615–16 (emphasis added). While the contract with CHISHOLM & CO. does not fall squarely within the above description because CHISHOLM was acting only as a broker between the BANK and Eximbank, it is apparent that Congress intended to include all contracts involved in importing and exporting goods to and from the United States. Furthermore, Bruno Ristau, then Chief of the Foreign Litigation Section of the Civil Division, Justice Department, testified at the hearings concerning the house bill. He stated that "if a government enters into a contract to purchase goods and *services,* that is considered a commercial activity. It avails itself of the ordinary contract machinery. It bargains and negotiates. It accepts an offer." *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary,* 94th Cong., 2d Sess. 28 (1976) ("1976 Hearings") (emphasis added). The contract with CHISHOLM & CO. involved the purchase of services.

The legislative history also suggests that courts should "inquire whether the activity in question is one which private persons ordinarily perform or whether it is peculiarly within the realm of governments." 1976 Hearings, at 53. Such an inquiry must be undertaken cautiously, however, since a broad interpretation could threaten to eviscerate the commercial activity exception altogether. For example, although only governments may contract for the purchase of military equipment, these would nevertheless be considered commercial activity. *Texas Trading, supra.* In this case, the general activity, engaging in con-

tracts in order to obtain lines of credit, is one in which private entities generally engage. *See Meadows v. Dominican Republic,* 628 F.Supp. 599 (N.D.Cal.1986) (contract for services to obtain a loan is an activity in which private persons generally engage). Even the particular activity here is not a uniquely governmental function. Although the BANK had the paramount authority in Jamaica to obtain foreign lines of credit, Defendants admit that private banks in Jamaica engaged in the same activities, though to a lesser degree.

■ Defendants argue that, because the BANK was acting in furtherance of the Jamaican Economic Recovery Program in seeking foreign credit for importers, its actions were governmental. It is the *nature* of Defendants' actions, however, which must be scrutinized in determining their character; not their *purpose*.[4] 28 U.S.C. Section 1603(d); *See also Transamerican Steamship Corp. v. Somali Democratic Republic ("Transamerican II"),* 767 F.2d 998 (D.C.Cir.1985); *Behring International, Inc. v. Imperial Iranian Air Force,* 475 F.Supp. 383 (D.N.J.1979). A contract, implied or otherwise, is inherently commercial, even when the ultimate purpose behind it is government regulation. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) (government of Nigeria liable for breach of contract for the purchase of nearly $1 billion worth of cement, even though it was to be used to build army barracks); *Callejo v. Bancomer,* 764 F.2d 1101 (5th Cir.1985) (Mexican national bank's sale of certificates of deposit was commercial in nature, even though its purpose was to comply with the sovereign decrees of the Mexican government); *Arango v. Guzman Travel Advisors Corp., supra* (commercial activity exception applied to contract claim, even though suit arose as a result of Dominican Republic's sovereign decision to deny Plaintiffs entry); *But cf. DeSanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1393 (5th Cir.1985) (national bank's refusal to honor a check was a governmental act).[5]

■ No one disputes that the regulation of imports and exports is a sovereign prerogative; or that the BANK has the power to redefine investment priorities; or that the BANK, in administering the Jamaican Economic Recovery Program, must decide with whom it will deal. These are all governmental acts. The act complained of, however, is not the BANK's administration of the Program, but the breach of its implied contract with CHISHOLM & CO. entered into *in furtherance* of that program. Once the BANK decides to contract with someone to obtain financing, it must follow the rules of the marketplace, and one of those rules is that contracts cannot be breached. *See Texas Trading, supra.* Therefore, the Court holds that the BANK's implied contract with CHISHOLM & CO. and its alleged misrepresentations constitute commercial activity. Counts I,

---

**4.** "Whenever a government enters the marketplace to buy or sell goods, its purpose ultimately is not to earn profits; in some sense, its motivation is the public good. Consequently, if the purpose of an activity defined in full whether the activity was sovereign or commercial, all government activities would be sovereign." *DeSanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1393 (5th Cir.1985).

**5.** *DeSanchez* involved a Nicaraguan citizen who had purchased a certificate of deposit from Banco Nacional de Nicaragua, a then privately-owned commercial bank. After the fall of the Somoza regime, the Sandinista government took over the bank. It issued regulations governing the use of the country's scarce foreign

exchange resources. Pursuant to those regulations, the government refused to honor Plaintiff's certificate. The Fifth Circuit held that the Sandinista's actions were sovereign activity. In that case, however, the government had suddenly undergone drastic change, and it took extraordinary measures to administer a rapidly depleting resource; i.e., foreign currency. Because of the crisis that existed in Nicaragua at the time, the Court in *DeSanchez* characterized the transaction at issue not as a sale of foreign currency, but as part of the regulation and supervision of that country's foreign exchange reserves. *Id.,* at 1392. The Court is confident that the Fifth Circuit would have ruled otherwise under less stressful political conditions.

IV, V, and VII may not be dismissed under the FSIA.

■ The same is not true, however, for the other acts alleged. The BANK has sovereign authority to regulate its economy, and in dealing with Eximbank in that capacity, it may choose who will obtain letters of credit for the country's banks and corporations. The BANK's instructions to Eximbank and its communication of investment priorities were part of its administration of the Jamaican Economic Recovery Program. The BANK's established policy with Eximbank called for the BANK's prior approval as to specific credit applications in order to establish priorities for Eximbank projects and investments in Jamaica and to control Jamaica's external debt. The regulation of imports and exports is a sovereign prerogative. *Mol, Inc. v. People's Republic of Bangladesh,* 736 F.2d 1326, 1329 (9th Cir.1984).

■ Similarly, the BANK's dealings with the companies who ultimately obtained commissions and its restrictions upon the SBA are also sovereign in nature. Moreover, all these acts took place in Jamaica. Even if they were commercial, their relationship to the United States was minimal, and does not justify jurisdiction under the FSIA. *See Montreal Trading, Ltd. v. Amax, Inc.,* 661 F.2d 864 (10th Cir.1981), *cert. denied,* 455 U.S. 1001, 102 S.Ct. 1634, 71 L.Ed.2d 868 (1982). Therefore, Counts II, III, VI, and VIII must be dismissed.

## 2. Contacts With the United States

■ The next issue is whether the BANK's acts in dealing with CHISHOLM & CO.—the only acts that remain relevant—had the sufficient jurisdictional nexus with the United States. In the world of international commerce and mass communications, in which much business is conducted through telephone calls, telexes, and wire transfers of intangible debits and credits, it can be difficult to determine exactly where an act such as the formation or breach of a contract takes place. *See Texas Trading, supra,* at 331, n. 30. The Court need not engage in such metaphysical inquiry, however, because it finds that the Defendants' acts had a direct effect in the United States, and therefore where the acts actually occurred is irrelevant.

Unlike persons, a corporation can only suffer financial loss. Therefore, as the Court in *Texas Trading* noted, the relevant inquiry is whether the Plaintiff CHISHOLM & CO. has suffered a direct financial loss in the United States. *Id.,* at 312. Such an effect can arise from the cancellation of a contract. *Carey v. National Oil Corp.,* 592 F.2d 673, 676–77 (2d Cir.1979) (*per curiam*). Here, the beneficiary of the contract that was breached was an American corporation. CHISHOLM & CO. had its place of business in the United States and it was to be paid in the United States. The failure to pay an American corporation in the United States creates a direct effect "in" the United States. *Texas Trading, supra; Callejo, supra,* at 1112; *Schmidt v. Polish People's Republic,* 579 F.Supp. 23 (S.D.N.Y.1984), *aff'd,* 742 F.2d 67 (2d Cir. 1984); *Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903 (S.D.N.Y. 1986); *Meadows, supra,* at 605.[6] There-

---

**6.** Defendants also claim that the effects within this country must not only be direct, but also substantial and foreseeable. The legislative history of the FSIA suggests that courts, in interpreting the "direct effects" clause, be guided by Section 18 of the Restatement (Second) of Foreign Relations Law of the United States (1965). *House Report, supra,* at 6618. That section governs the extent to which American law may be applied to conduct overseas; however, it concerns the extraterritorial effect of American *substantive* law, not the jurisdictional reach of American courts. Some courts have nevertheless viewed Section 18 as evidence of Congres-

sional intent. *See Callejo, supra; Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1110–11 (D.C.Cir.1982), *cert. denied,* 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). Others have found that the limitations in the Section that the effect be "substantial" and "foreseeable" are inapposite to the "direct effect" clause of Section 1605(a)(2). *Texas Trading, supra,* at 311, n. 32. In *Texas Trading,* the Court noted that in enacting the FSIA, Congress did not intend to significantly constrict jurisdiction; only to regularize it. *Id.,* at 313.

fore, subject matter jurisdiction exists as to Counts I, IV, V, and VII.

### 3. Personal Jurisdiction

■ Under the FSIA, personal jurisdiction exists wherever there is subject matter jurisdiction and there has been adequate service of process. 28 U.S.C. Section 1330(b). Since Defendants do not contest service of process, personal jurisdiction would seem to be present.

■ Any exercise of personal jurisdiction, however, even if authorized by statute, must comply with the constitutional standards of due process. *Texas Trading, supra,* at 313. Under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny, to be hailed into court a defendant must have certain "minimum contacts" with the forum so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.,* at 316, 66 S.Ct. at 158, *citing Milliken v. Meyer,* 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940).[7] Under the *International Shoe* line of cases, the Court must examine the extent to which Defendants availed themselves of the privileges of American law, the extent to which litigation in the United States would be foreseeable to them, the inconvenience to Defendants of litigating in the United States, and the countervailing interests of the United States in hearing the suit. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 297, 100 S.Ct. 559, 564, 567, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court,* 436 U.S. 84, 97–98, 98 S.Ct. 1690, 1699–1700, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958); *McGee v. Interna-*

*tional Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *International Shoe, supra,* 326 U.S. at 316, 66 S.Ct. at 158.

■ Applying these factors, the Court finds that the exercise of personal jurisdiction would not violate due process. In participating in the Eximbank program, and having the opportunity to obtain lines of credit from American banks for Jamaican imports, Defendants have certainly availed themselves of the privileges of American law. Moreover, by negotiating for and obtaining the services of CHISHOLM & CO., an American corporation, through the use of the United States mail and phone systems, and by agreeing to pay Plaintiffs in the United States, Defendants should have foreseen that litigation in this country might follow in the event they failed to meet their obligations. *See Gilson v. Republic of Ireland,* 682 F.2d 1022, 1028 (D.C.Cir.1982); *Meadows, supra,* 628 F.Supp. at 607.

■ Litigation here is not unduly inconvenient for Defendant. The representatives of the various banks with whom CHISHOLM negotiated on behalf of the BANK, and the relevant documents they possess, are all in the United States; Eximbank and its documents are also in the United States; and both Plaintiff CHISHOLM and Defendant BARBER reside in the United States.[8] Lastly, the FSIA itself demonstrates Congressional solicitude for the rights of American citizens and corporations involved in commerce with foreign instrumentalities, and its interest in providing them with "access to the courts." *House Report,* at 6605. Therefore, this Court may exercise personal jurisdiction.

---

In any case, the effects in this case were both substantial and foreseeable. Defendants knew that CHISHOLM & CO. was an American corporation and that its business would be conducted in the United States. It knew that its failure to pay CHISHOLM & CO. would cause effects in this country. *Callejo, supra.*

7. When service under 28 U.S.C. Section 1608, the relevant area in delineating contacts is the entire United States. *Texas Trading, supra,* at 314.

8. For this reason, the Court also denies Defendants' motion to the extent it is based on the doctrine of forum non conveniens. Denial is without prejudice, however; should discovery produce new and substantial evidence that the United States in general, and Florida in particular, is an inconvenient forum to litigate the remaining counts of the Complaint, Defendants may re-submit their motion as to this issue.

## B. Act of State

■■■■■ Defendants also claim that this action is nevertheless barred under the act of state doctrine. The act of state doctrine requires that a court, after exercising jurisdiction, nevertheless decline to decide the merits of a case if in doing so it would need to judge the validity of the public acts of a sovereign state performed within its own territory. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Thus, under the act of state doctrine, a Court must analyze the conduct not only of the Defendant itself, but also of the government behind it.

■■■■ Usually, a finding of commercial activity precludes a finding of act of state, since the two doctrines, while not identical, are somewhat related.[9] *See Texas Trading, supra; cf. Arango, supra. Arango* involved a family who took a vacation to the Dominican Republic, only to be rebuffed by the government upon their arrival, apparently because they were "undesireable aliens," and ordered to leave the country immediately. The Fifth Circuit, after finding that the Defendant airline's activities were commercial, nevertheless dismissed Plaintiffs' claims for battery and false imprisonment, because to decide them would require an adjudication of the legality and propriety of the foreign state's immigration authorities' actions. *Id.,* at 1380.[10]

■■■■ In this case, the Court, in deciding the rights of the parties under the implied contract, need not adjudicate the legality or propriety of any act of the government of Jamaica performed solely within its own borders. It does not threaten to embarrass the executive branch in its foreign affairs, and hence does not seriously implicate the relevant policy considerations. *Texas Trading,* 647 F.2d at 316, n. 38. As to the remaining counts of the Complaint, the act of state doctrine does not apply.

## C. The Remaining Substantive Counts

Defendants also challenge most of the remaining counts of the Complaint on substantive grounds.[11] The Court now examines those counts—IV, V, and VII—to determine if they sufficiently allege a cause of action under federal or state law.

### 1. Fraud

■■■■ The five elements required to state a cause of action for fraud under Florida law are:

(1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purposes of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage to the plaintiff.

*Rudy's Glass Construction Co. v. Robins,* 427 So.2d 1051 (Fla. 3d DCA 1983). Plaintiffs allege in Count IV: that the Defendants failed to inform Plaintiffs of their instructions to Eximbank to exclude Plaintiffs from the Jamaican Economic Recovery Program when they encouraged Plaintiffs to continue seeking lines of credit; that Defendants knew this omission was material; that Defendants omitted this fact to induce Plaintiffs to continue seeking lines of credit; that Plaintiffs acted in re-

---

**9.** In *Sabbatino,* the Supreme Court emphasized that the doctrine of sovereign immunity did not supersede the act of state doctrine; the latter is based on prudential rather than jurisdictional grounds. *Id.,* 376 U.S. at 421–23, 438, 84 S.Ct. at 936–38, 945. Nevertheless, in most cases they are two sides of the same sovereign coin: where the activity is commercial, a foreign state's governmental acts will usually not have to be questioned; conversely, when the activity is not commercial, a court would be inquiring into governmental acts in adjudicating the claims. Thus, there is a correlation between a finding of commercial activity and a refusal to find an act of state.

**10.** The Court refused, however, to dismiss the contract and negligence claims against the airline, emphasizing that the sale of airline tickets performed outside the sovereign's boundaries are not "acts of state." 621 F.2d at 1380, n. 11.

**11.** Defendants concede that the Plaintiffs have alleged sufficient facts in Count 1 to state a cause of action for quantum meruit. Defendants' Memorandum, p. 45.

liance thereon; and that the Plaintiffs were damaged as a result.

■ These allegations are sufficient to state a cause of action under Florida law. Where one party having superior knowledge fails to disclose a material fact not discoverable by ordinary observation, a fraud has been committed. *See Nessim v. DeLoache,* 384 So.2d 1341, 1344 (Fla. 3d DCA 1980). Furthermore, the allegations in the Complaint are stated with the particularity required by Rule 9(b), Fed.R.Civ.P. Rule 9 merely requires the identification of the circumstances constituting the fraud so that the Defendant can prepare an adequate answer from the allegations. *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226 (1st Cir.1980); *Walling v. Beverly Enterprises,* 476 F.2d 393 (9th Cir. 1973). Plaintiffs have complied with the rule. Defendants cannot complain that they lack adequate notice of Plaintiffs' claim.

### 2. Civil Theft

■ Count V of the Complaint alleges that Defendants committed civil theft in refusing to pay for Plaintiffs' services. *Fla.Stat.* Section 812.014(1) provides:

> A person is guilty of theft if he knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent to, either temporarily or permanently:
>
> (a) Deprive the other person of a right to the property or a benefit therefrom.
> (b) Appropriate the property to his own use or to the use of any person not entitled thereto.

Included within the definition of "property" is the provision of services. Section 812.012(3)(c). Plaintiffs have alleged that Defendants acted with the requisite intent, and, while they have not identified the spe-

cific "property" involved, the previous incorporated paragraphs of the Complaint sufficiently indicate that the "property" was the services that the Plaintiffs rendered. Therefore, Count V adequately states a cause of action for civil theft.[12]

### 3. Racketeering Influenced and Corrupt Organizations Act

■ Count VII of the Complaint alleges that the Defendant BANK and BARBER violated the federal and Florida Racketeering Influenced and Corrupt Organizations Acts ("RICO") by using the United States mail system to defraud the Plaintiff. 18 U.S.C. Section 1962(c) provides in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity* or collection of unlawful debt.

(emphasis added). The question of how much conduct constitutes a "pattern" of activity has spawned considerable controversy. The statute itself requires at least two acts. 18 U.S.C. Section 1961(5). Recently, however, the Supreme Court has indicated that this may not be enough. In *Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346, the Court noted:

> ... [T]he definition of a "pattern of racketeering activity" differs from the other provisions in Section 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," Section 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in com-

---

**12.** While the Florida civil theft statute is inapplicable in an ordinary breach of contract action, *Advanced Surgical Technologies, Inc. v. Auto-* *mated Instruments, Inc.,* 777 F.2d 1504 (11th Cir.1985), this case also involves fraud.

mon parlance two of anything do not generally form a "pattern."

—— U.S. at ——, n. 14, 105 S.Ct. at 3285, n. 14.[13] Relying on this language, lower federal courts have dismissed complaints that do not allege continuous criminal activity. *See Professional Assets Management, Inc. v. Penn Square Bank, N.A.,* 616 F.Supp. 1418 (D.Okl.1985); *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985).

▆▆ Plaintiffs allege in their Complaint, Paragraph 68, that on two separate occasions the Defendants used the United States mail to execute a fraud. The first time was a letter to Eximbank instructing it not to deal with CHISHOLM & CO.; the second was a letter encouraging CHISHOLM & CO. to continue its efforts to obtain lines of credit.[14] Under *Sedima,* these two acts do not constitute a pattern. Furthermore, the letter to Eximbank does not constitute a predicate act since, as discussed *infra,* the BANK's communications with Eximbank are protected by sovereign immunity. This leaves only one fraudulent act, which is insufficient to establish a cause of action under RICO. Therefore, the RICO count must be dismissed.[15]

It is:

ORDERED AND ADJUDGED that Defendants' motion is hereby GRANTED IN PART and DENIED IN PART. Counts II, III, VI, VII, and VIII are hereby DISMISSED with prejudice. Defendants shall file an Answer to the remaining three counts of the Complaint within twenty (20) days of this Order. It is further

ORDERED AND ADJUDGED that counsel for Plaintiff is directed to meet with all other counsel of record and thereafter to file a Scheduling Report within twenty (20) days of the date of this Order.

Counsel shall comply with all the requirements enumerated in Rule 14(A) of the Local Rules. In addition, the Scheduling Report shall contain:

1. an estimate of time required to complete discovery;

2. an estimate of time required to try the case;

3. whether trial will be by jury or non-jury;

4. probability of settlement;

5. a factual summary of Plaintiff's claim; and

6. a factual summary of Defendant's case.

Upon receipt of the Scheduling Report, the Court will set a trial date and discovery schedule.

---

**13.** As the Court pointed out, the legislative history supports this view. The Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Senator McClellan, the bill's Senate sponsor, also emphasized that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970). *See also id.,* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender").

**14.** Although Plaintiffs claim that the second predicate act included "numerous letters" to CHISHOLM & CO., Complaint, Paragraph 69, they attach only one letter to the Complaint; that, and the language claiming that there were only "two separate occasions" leads the Court to conclude that only one letter was involved.

**15.** The Florida RICO statute, *Fla.Stat.* Section 895.01 *et seq.,* also a part of Count VII, is more restrictive in its scope than its federal counterpart. It requires continuity of criminal activity as well as similarity and interrelatedness among them. Section 895.02(4). Thus, while the federal statute has been interpreted broadly and has been used against respected businesses engaged in criminal conduct, the Florida statute's target is professional or career criminals and not non-racketeers who have committed relatively minor crimes. *Compare Sedima, supra, with Bowden v. State,* 402 So.2d 1173 (Fla.1981). Regardless of Plaintiff's numerous allegations against the Defendants, the Court does not view the Defendants as career criminals that would be a target of the Florida RICO statute. Furthermore, Florida RICO also requires two predicate acts. Section 895.02(4). Count VII must therefore be dismissed based on state law as well.

Failure to comply with the requirements of Local Rule 14 and Fed.R.Civ.P. 16 "will subject the party or counsel to appropriate penalties, including, but not limited to, dismissal of the cause or striking of defenses and entry of judgment." Local Rule 14(L).