**DOMINICAN ENERGY LIMITED, INC., a Florida corporation, Plaintiff,**

v.

**The DOMINICAN REPUBLIC, a foreign nation, et al., Defendants.**

**No. 94–1129–CIV–ORL–18.**

United States District Court, M.D. Florida, Orlando Division.

Oct. 5, 1995.

Daniel N. Brodersen, Dempsey & Associates, P.A., Orlando, FL, Gary S. Salzman, Law Office of Gary S. Salzman, P.A., Joseph B. Denion, Swann, Hadley, Denion & Alvarez, P.A., Winter Park, FL, for Dominican Energy Limited, Inc., a Florida corporation.

Michael T. Moore, J. Raul Cosio, Holland & Knight, Miami, FL, for Dominican Republic, a foreign nation.

Joseph P. Klock, Jr., Joseph F. Dearing, Steel, Hector & Davis, Miami, FL, for Carmen Rosa Hernandez, in her official capacity and individually.

Christopher M. Rundle, Law Office of Christopher M. Rundle, P.A., Coral Gables, FL, for Marco A. Subero Sajium, in his official capacity and individually.

Miguel San Ben, Santo Domingo, Dom. Rep., pro se.

William T. Edy, Law Offices of William T. Edy, Cape Coral, FL, for Prudence Corporation, a foreign corporation.

Aaron R. Wolfe, Doran, Walters, Rost, Selter & Wolfe, Daytona Beach, FL, for Doran, Walters, Rost, Selter & Wolfe.

## ORDER

G. KENDALL SHARP, District Judge.

In this case, Dominican Energy Limited, Inc. (DEL), a Florida corporation, sues the Dominican Republic, a foreign nation, Carmen Rosa Hernandez, in her official capacity and individually, Dr. Mario Read–Vittini, in his official capacity and individually, Marcos A. Subero Sajium, in his official capacity and individually, Miguel San Ben, in his official capacity and individually, Jose Bonilla, individually, and the Prudence Corporation, a foreign corporation. DEL claims that defendants' actions caused it to suffer significant financial losses, which it now seeks to recover, in addition to other relief. DEL's eight-count amended complaint asserts causes of action under federal and state law. The case is presently before the court on the Dominican Republic's motion to dismiss, to which DEL responded in opposition. (Docs. 30, 45.) After a thorough review of the case file and relevant law, the court finds that it lacks the subject matter jurisdiction necessary to adjudicate DEL's claims against the Dominican Republic.

## I. Findings of Fact

DEL is a Florida corporation that exists solely to finance, construct, operate and manage electrical generation facilities in the Dominican Republic. DEL's predecessor in interest in this case is Bomar International, Ltd., Inc. (Bomar), which is a Florida corporation that apparently operates a business similar to that of DEL. At all times relevant to this lawsuit, Lewis R. Tolley (Tolley) was, and continues to be, the President and Chief Executive Officer of both DEL and Bomar. Tolley acted on behalf of DEL and Bomar in all transactions relevant to this lawsuit.

From August 1989 until December 1990, Bomar was interested in placing within the Dominican Republic facilities for the collection, handling, and incineration of refuse, with the potential for the facilities to generate electricity. On behalf of Bomar, Tolley travelled to the Dominican Republic where he met with the Mayor of Santo Domingo (Mayor) and members of Santo Domingo's City Council to present Bomar's proposal to place some of the facilities in Santo Domingo. During Tolley's last of four trips to Santo Domingo, the Mayor informed Tolley that Bomar would have to pay $10,000.00 to ensure that its proposal would be accepted.[1] The Mayor further indicated that Bomar would be required to pay $10,000.00 to the President of Santo Domingo's City Council and $10,000.00 to an unnamed person in the Palace of the Dominican Republic. Ultimately, Bomar's proposal was not accepted, in its view, because it refused to make the requested payments totalling $30,000.00.

Two years later, in February 1992, defendant Prudence Corporation (Prudence) solicited Bomar's assistance in placing within the Dominican Republic a cement plant with associated and supportive electrical power generation facilities. At Prudence's request, Tolley travelled to the Dominican Republic, where Prudence representatives introduced Tolley to Dr. Mario Read–Vittini (Vittini), who at that time was a private citizen of the Dominican Republic and a non-government, practicing attorney. To aid Bomar in efforts to place the desired facilities in the Dominican Republic, Vittini offered to act as Bomar's representative in the Dominican Republic. Vittini felt that his good reputation, close political contacts, and apparent familiarity with the Dominican Republic's government would benefit Bomar.

At all times relevant to this lawsuit, Marcos A. Subero Sajium (Subero) was a citizen of the Dominican Republic and the Administrator General of the Corporacion de Electricidad (CDE), the political subdivision of the Dominican Republic responsible for providing the country and its citizens with electrici-

---

**1.** All references to payments, donations, costs, expenses and profits are expressed in United States Dollars.

ty. DEL claims that on or about March 31, 1992, at Subero's request, Vittini solicited from Bomar a general proposal regarding the placement of electrical generation facilities (facilities), as well as other projects that were available for placement in the Dominican Republic. In April 1992, Bomar responded by submitting the requested proposal to Vittini and Subero. The proposal contemplated a final contract which, if entered, would have required payments to be made to DEL in the United States.

On or about May 2, 1992, Tolley met with Prudence representatives and Vittini in Daytona Beach, Florida to discuss the status of Bomar's proposals. At the meeting, Prudence and Vittini asked that Bomar supplement its June 1992 general proposal with a complete, detailed and in-depth proposal regarding the placement of the facilities. Tolley later travelled to the Dominican Republic, at the request of Vittini, Prudence, and Subero, to present Bomar's more detailed proposal.

On June 20, 1992, in Jacksonville, Florida, Bomar, Prudence, and Vittini entered a Representation Agreement (Agreement). The Agreement provided that Vittini would serve as Bomar's exclusive representative in the Dominican Republic and that Vittini and Prudence would use their best efforts to assist Bomar in acquiring electrical power contracts in the Dominican Republic. Bomar later assigned its rights and obligations under the Agreement to DEL. The Dominican Republic was not a party to the Agreement.[2]

After the Agreement was executed, Vittini informed Tolley that Bomar should make a $300,000.00 donation to the controlling political party in the Dominican Republic to ensure that Bomar's proposals would be accepted and implemented there. Bomar declined to make the payment.

On or about September 29, 1992, Tolley, Vittini, and other Bomar representatives met in Jacksonville, Florida. During that meeting, Vittini informed Tolley that Subero required the payment of an unspecified sum of money to continue the advancement of Bo-

mar's projects in the Dominican Republic. Bomar again refused to make any payment.

On October 26, 1992, Bomar representatives travelled to the Dominican Republic to meet with representatives of the CDE, various banking and financial institutions, and several government officials regarding Bomar's pending proposals. During this trip and a subsequent trip on December 6, 1992, Vittini again urged Bomar to make a $300,000.00 donation to the Dominican Republic's controlling political party to ensure that its proposals would be approved. Vittini also recommended that Bomar pay him additional advances for his daily operating expenses. Bomar rejected both of Vittini's recommendations. DEL claims that Vittini later failed to make himself available to fulfill his obligations under the Agreement because Bomar refused to make the requested payments.

On or about March 28, 1993, Vittini, Prudence and Tolley, now on behalf of DEL, met in Miami, Florida. At the meeting, Vittini indicated that he had not actively performed his obligations under the Agreement during the previous five months because he had been working for the political party in the Dominican Republic. Further, Vittini announced that he would no longer be able to perform his obligations under the Agreement, and introduced Raphael Llaneza (Llaneza) as his agent and replacement.

On June 4, 1993, defendant Carmen Rosa Hernandez (Hernandez), Administrative Secretary to the President of the Dominican Republic, allegedly instructed Subero and the CDE to conduct in-depth negotiations with DEL for the placement of Facilities and related projects in the Dominican Republic. The negotiations occurred in mid-June 1993; and on or about June 24, 1993, DEL submitted its first official offer to the CDE outlining the specific terms and costs per kilowatt hour for which DEL was willing to provided electricity to the Dominican Republic through the CDE.

DEL claims that during June 1993, Llaneza twice requested that DEL pay $150,000.00

---

**2.** Although Vittini was named Governor/Director of the Central Bank of the Dominican Republic in August 1993, he held no governmental office when he entered the Agreement, and discontinued his involvement in the Agreement before taking his official position.

to the controlling political party for the President of the Dominican Republic's re-election campaign. Llaneza indicated that the payment was necessary to ensure DEL's success in the Dominican Republic, and that the request had emanated from Hernandez. DEL refused to make the requested payments.

On Tolley's next trip to the Dominican Republic, he met with Hernandez and discussed her request for the $150,000.00 political contribution. Hernandez indicated that if the payment was not made, DEL would not be awarded the facilities contract. Hernandez also informed Tolley that the President of the Dominican Republic would be displeased if the payment was not made, and that other companies had already made similar payments in return for being awarded government contracts. Tolley indicated that the requested payments would not be made under any circumstances, and that if the requests for such payments continued DEL would report the conduct to the proper authorities. After Tolley rejected Hernandez's request for the political donation, DEL claims that all good faith negotiations with the Dominican Republic and the CDE essentially ended, and that Hernandez failed or refused to provide directives to the CDE that were necessary for DEL's projects to go forward.

In sum, DEL claims that it relied on the Dominican Republic's assurances that the negotiations regarding placement of the facilities were being conducted in good faith. Over the course of the negotiations, DEL claims to have accrued expenses amounting to approximately $1.7 million in developing, negotiating, and presenting projects to the Dominican Republic through the CDE. DEL further claims that had it been awarded the contract to construct and operate the facilities, it would have enjoyed profits ranging between $22 million and $250 million, depending on how DEL chose to exploit the contract once awarded.

## II. Legal Discussion

### A. Legal Standard for Motion to Dismiss

When considering a motion to dismiss, the court must accept factual allegations in the complaint as true, and otherwise view the allegations in a light most favorable to the plaintiff. *Linder v. Portocarrero,* 963 F.2d 332, 334 (11th Cir.1992) (citing *Quality Foods de Centro Am., S.A.. v. Latin Am. Agribusiness Dev. Corp. S.A.,* 711 F.2d 989, 994–95 (11th Cir.1983)). If the motion to dismiss asserts a lack of subject matter jurisdiction, the plaintiff has the burden of showing that it has properly invoked the court's jurisdiction. *Strickland v. Holiday RV Superstores,* 817 F.Supp. 951, 952 (M.D.Fla. 1993) (citing *Barton v. City of Eustis,* 415 F.Supp. 1355, 1357 (M.D.Fla.1976)). If the motion to dismiss asserts a lack of personal jurisdiction over the defendant, the plaintiff must establish a *prima facie* case of personal jurisdiction to survive the motion to dismiss. *See Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990). However, the issue of subject matter jurisdiction is "fundamentally preliminary" to the issue of personal jurisdiction and, thus, must be decided first. *See Leroy v. Great W. United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 2714, 61 L.Ed.2d 464 (1979). Finally, to dismiss a claim for failure to state a claim upon which relief can be granted, the defendant must demonstrate that the plaintiff can prove no set of facts which would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *accord Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir. 1990).

### B. The Dominican Republic's Motion to Dismiss

In its complaint, DEL alleges causes of action against the Dominican Republic for violation of 18 U.S.C. §§ 1961–64 (the federal RICO statute) and Florida Statutes Chps. 772.101–104 (the Florida RICO statute). DEL also sues the Dominican Republic under common law for tortious interference with a business relationship, conspiracy to interfere, and unjust enrichment. (Complaint at 22, 26, 31–33.) The Dominican Republic's motion to dismiss asserts a lack of subject matter jurisdiction and personal jurisdiction with regard to all counts of DEL's complaint in which the Dominican Republic was sued. Further, the motion to dismiss asserts that DEL failed to state a claim upon which relief can be granted with regard to

DEL's claim for tortious interference with an advantageous business relationship. However, the Dominican Republic did not move to dismiss DEL's claims for conspiracy to interfere and unjust enrichment.

### 1. Subject Matter Jurisdiction

The Dominican Republic's motion to dismiss asserts that the court lacks the requisite subject matter jurisdiction to adjudicate DEL's claims. DEL disagrees and urges that the court has jurisdiction pursuant to 28 U.S.C. §§ 1330, 1602–11, the Foreign Sovereign Immunities Act (FSIA).

■■■ Because the Dominican Republic is, without dispute, a foreign nation, the FSIA is the court's exclusive source of subject matter jurisdiction in the instant case. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). To establish subject matter jurisdiction under the FSIA, the plaintiff must overcome the presumption that foreign states are immune from suit in United States courts. *See* 28 U.S.C. § 1604 (1988); *accord Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610–11, 112 S.Ct. 2160, 2164–65, 119 L.Ed.2d 394 (1992). To overcome the presumption that foreign states are immune from suit, a plaintiff must prove that the conduct which forms the basis of its complaint falls within one of the statutorily defined exceptions. *Id.* However, while the plaintiff bears the initial burden to rebut the presumption of immunity by offering evidence that an exception applies, the ultimate burden of persuasion remains with the party claiming immunity. *See Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 (5th Cir.1989).

28 U.S.C. § 1605 sets forth the exceptions that, if applicable, overcome the presumption of immunity. *See generally* 28 U.S.C. § 1605 (1988). The exception at issue in the case at bar provides, in relevant part, that:

A foreign state shall not be immune from the jurisdiction of [the court] in any case in which the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (1988). This exception is commonly known as the commercial activity exception.

Turning to the merits, the court's analysis properly begins by identifying the particular conduct on which DEL's action is "based" for purposes of the FSIA. *See Saudi Arabia v. Nelson*, 507 U.S. 349, ——, 113 S.Ct. 1471, 1477, 123 L.Ed.2d 47 (1993) (citing *Texas Trading & Milling Corp. v. Federal Republic of Nig.*, 647 F.2d 300, 308 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982)). While the FSIA does not define the phrase "based upon," courts have most often read the phrase to mean "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* (citations omitted). In the instant case, DEL's claims rely heavily on its allegations that the Dominican Republic, through various governmental agencies and representatives, attempted to extort bribes from DEL, and its predecessor in interest, as a condition precedent to the award of government contracts. DEL claims that it was not awarded the government contracts then under negotiation, and suffered substantial financial loss, solely because it refused to pay the alleged bribes. These allegations combined with the claim that the Dominican Republic's attempted extortion occurred over a substantial length of time essentially form the basis for DEL's claims. (Complaint at 24–25, 28.)

The Dominican Republic argues that because the alleged acts of extortion and bribery on which DEL's claims rely are not commercial in nature, but rather criminal in nature, DEL's claims fail to fall within the commercial activities exception. To the contrary, DEL invokes the third clause of 28 U.S.C. § 1605(a)(2) which does not require the act upon which plaintiff's claim is based to be commercial in nature. *See* 28 U.S.C. § 1605(a)(2) (1988) (requiring merely that the act on which plaintiff's claim is based have been done "in connection with a commercial activity"). Therefore, any "act" that occurs outside the territory of the United States and forms the basis of a plaintiff's complaint will serve to confer subject matter jurisdiction

under the third clause of § 1605(a)(2), so long as the plaintiff can prove that the act occurred in connection with commercial activities outside the United States and caused a direct effect in the United States.

Thus, the issue now becomes whether the actions upon which DEL's complaint is based were taken in connection with commercial activity within the meaning of the FSIA. The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d) (1988). Further, the commercial character of an act must be determined by reference to the nature of the act and not its purpose. *Id.* Taken together, these two provisions mean that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are commercial within the meaning of the FSIA." *Weltover,* 504 U.S. at 614, 112 S.Ct. at 2166. To determine whether the foreign state acted in the manner of a private player in the market, the court must look to the type of actions in which the foreign state engaged. *Id.* If the actions are the type that private persons are able to legally engage, then the actions are commercial under the FSIA. *See Rush–Presbyterian–St. Lukes Medical Cent. v. Hellenic Republic,* 877 F.2d 574, 578 (7th Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989).

Taking the allegations in DEL's complaint as true, the Dominican Republic, through various agencies and representatives, solicited Bomar and later DEL to submit bids and proposals regarding the construction and operation of electrical generation facilities desired by the Dominican Republic. In efforts to satisfy the Dominican Republic's needs, Bomar representatives met with Dominican representatives on numerous occasions to discuss and further negotiate Bomar's proposal. Despite negotiations that spanned several years and the submission of at least three different proposals to the Dominican Republic by Bomar and later DEL, the two sides never entered a contract.

Ignoring the allegations of extortion and bribery, the initial relationship between Bomar, later DEL, and the Dominican Republic was entirely commercial, as evidenced by the fact that any private person may enter the marketplace and solicit bids and proposals from contractors. While private individuals do not customarily solicit proposals to build electrical generation facilities, the FSIA mandates that the nature of the relationship is dispositive and the purpose is irrelevant. *See* 28 U.S.C. § 1603(d) (1988). Thus, the nature of the relationship between the parties at bar was inherently commercial, and the fact that a contract was not ultimately entered does not change the commercial nature of the conduct. *See Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 452–53 (6th Cir.1988). Consequently, the court finds that the Dominican Republic's solicitation of business proposals from Bomar and later DEL regarding the construction and placement of electrical generation facilities constituted commercial activity within the meaning of the FSIA.

Having determined that the Dominican Republic engaged in commercial activity, the issue becomes whether the actions which form the basis of DEL's complaint were performed "in connection" with the Dominican Republic's commercial activity. The term "in connection with" is not statutorily defined in the FSIA. When faced with a similarly undefined term in the FSIA, the Supreme Court relied on the plain meaning of the term. *See Nelson,* 507 U.S. at ——, 113 S.Ct. at 1477 (citing Webster's New Int'l Dictionary (3d ed. 1976)). The same tactic is appropriate here. The word "connection" is defined as being "related in a practical way" to another thing. *See* Webster's New Int'l Dictionary 565 (2d ed. 1942) (unabridged). Accordingly, because the alleged extortion upon which DEL's claims are based occurred during the course of commercial negotiations and because the continuation of contract negotiations was conditioned upon whether or not the payments were made, the acts of alleged extortion in DEL's complaint occurred "in connection with" commercial activity as defined by the FSIA. Further, because most, if not all, of the attempts to extort bribes from Bomar and DEL occurred in the Dominican Republic, the court finds

that the acts upon which DEL's complaint is based occurred outside the territory of the United States in accordance with clause three of 28 U.S.C. § 1605(a)(2).

■ Having concluded that the acts upon which DEL's complaint is based occurred in connection with the Dominican Republic's commercial activity outside the United States, the court must now determine whether the acts about which DEL complains caused a "direct effect in the United States" within the meaning of the FSIA. *See* 28 U.S.C. § 1605(a)(2) (1988). In 1992, the Supreme Court reasoned that an effect is direct if it follows as an immediate consequence of the defendant's activity. *Weltover*, 504 U.S. at 618, 112 S.Ct. at 2168. Further, the Court expressly rejected a suggestion that 28 U.S.C. § 1605(a)(2) requires that an effect be substantial and foreseeable in order to be "direct." *Id.*

DEL relies upon several cases to support its position that the "direct effect" element is satisfied. However, all of the cases on which DEL relies arose because of contractual breaches that caused the plaintiff to suffer damage. *See Meadows v. Dominican Republic*, 817 F.2d 517 (9th Cir.1987); *Texas Trading*, 647 F.2d at 312; *Honduras Aircraft Registry, Ltd. v. The Government of Honduras*, 883 F.Supp. 685 (S.D.Fla.1995); *Chisolm & Co. v. Bank of Jamaica*, 643 F.Supp. 1393 (S.D.Fla.1986) (implied contract). The case at bar is distinguishable from all cases on which DEL relies because DEL and the Dominican Republic were not parties to any contract.

Because the parties to the case at bar were not contractually obligated to one another, formally or impliedly, and were only involved in negotiations the court finds *Siderman de Blake v. Republic of Argentina* instructive. 965 F.2d 699 (9th Cir.1992), *cert. denied*, ⎯ U.S. ⎯, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). The *Siderman* court found that:

> [M]ere financial loss suffered by a person, whether individual or corporate, in the United States is not, in itself, sufficient to constitute a 'direct effect' ... However, in cases where a plaintiff's claim is for breach of a contract providing that payment or performance must be made in the United States, the 'direct effect' requirement has been deemed satisfied.

965 F.2d at 710. While *Siderman* was decided before *Weltover*, the Supreme Court's decision in *Weltover* does not disturb the validity of the quoted proposition. *See Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 255 n. 8 (S.D.N.Y.1993) (relying on *Siderman* in light of *Weltover*).

Further, the circumstances giving rise to DEL's claimed financial losses bear an insufficient connection to the United States to confer subject matter jurisdiction under the FSIA. DEL urges that because it is a United States corporation and because it would have been paid in the United States had it been awarded the contract, its financial losses satisfy the "direct effect in the United States" element of 28 U.S.C. § 1605(a)(2). DEL never entered a contract with the Dominican Republic, and consequently the Dominican Republic owed DEL no legal duty in the United States or elsewhere. In determining whether an effect was sufficiently "in the United States" to confer subject matter jurisdiction, the United States Court of Appeals for the Tenth Circuit recently found quite significant the fact that "no part of the contract in [the] case was to be performed in the United States" and that the "defendants' performance of their contractual obligations had no connection at all with the United States." *United World Trade v. Mangyshlakneft Oil*, 33 F.3d 1232, 1237 (10th Cir. 1994). The *United World Trade* court distinguished its case from *Weltover* by noting that *Weltover* involved a contract under which payments were legally owing and payable in the United States, and that the defendant's unilateral act of rescheduling the payments caused a "direct effect in the United States." *Id.* (citing *Weltover*, 504 U.S. at 618–19, 112 S.Ct. at 2168–69). The case at bar is similarly distinguishable from *Weltover*.

Thus, the only reason that DEL's financial losses bear any relationship to the United States is the purely fortuitous fact that DEL is a United States corporation. As the Tenth Circuit correctly noted, "[t]he requirement that an effect be 'direct' indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas

transaction manage eventually to reach the shores of the United States." *United World Trade,* 33 F.3d at 1238. Further, "the fact that [DEL] is an American corporation that suffered a financial loss [is not] sufficient to place the direct effect of the defendants' actions 'in the United States.'" *Id.* at 1239; *see also Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1111 (5th Cir.1985). To find otherwise would be to "interpret § 1605(a)(2) in a manner that would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state." *Id.* The Supreme Court's interpretation of 28 U.S.C. § 1605(a)(2), as well as the face of the statute, indicates that Congress did not so intend. Consequently, the court finds that DEL has not satisfied the direct effect element of 28 U.S.C. § 1605(a)(2).

The court, therefore, finds that DEL has failed to rebut the presumption that the Dominican Republic is immune from suit. Accordingly, the court lacks the requisite subject matter jurisdiction to adjudicate any of DEL's claims against the Dominican Republic. Thus, the court need not reach the other issues in this case regarding the Dominican Republic.

### III. Conclusion

The court finds that DEL has not satisfied the "direct effect" element of the third clause of 28 U.S.C. § 1605(a)(2), which precludes the court's subject matter jurisdiction over any of DEL's claims against the Dominican Republic. Therefore, the court **GRANTS** the Dominican Republic's motion to dismiss (Doc. 30.) and directs the clerk of court to enter a judgment in accordance with this order.

It is SO ORDERED.