**In re JARAX INTERNATIONAL, INC., Debtor.**

**Jeanette E. TAVORMINA, Trustee in Bankruptcy for Jarax International, Inc., Plaintiff,**

v.

**CAPITAL FACTORS, INC. and Capital Bank, Defendants.**

Bankruptcy No. 86–04029–BKC–AJC.
Adv. No. 88–0567–BKC–AJC–A.

United States Bankruptcy Court, S.D. Florida.

Oct. 4, 1990.

John H. Genovese, Holland & Knight, Miami, Fla., for Jeanette Tavormina, Trustee.

Gregory A. Martin, Coffey Aragon Martin, Miami, Fla., for Capital Bank & Burlington, P.A.

Michael W. Ullman, Ullman & Ullman, North Miami Beach, Fla., for Capital Factors.

## MEMORANDUM DECISION ON COUNT I

A. JAY CRISTOL, Bankruptcy Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on for trial before the Court on the 12th and 13th days of October, 1989, upon Count I of Plaintiff's Second Amended Complaint which seeks this Court to declare that CAPITAL FACTORS, INC. was the alter ego of CAPITAL BANK, the instrumentality of CAPITAL BANK, an agent for CAPITAL BANK, a partner of CAPITAL BANK and/or a joint venturer of CAPITAL BANK, and the Court having heard the testimony, examined the evidence and stipulations presented, observed the candor and demeanor of the witnesses, and considered the arguments of counsel and being otherwise fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

### I. FINDINGS OF FACT

1. CAPITAL BANK owns all of the stock of CAPITAL FACTORS, INC. Trial Transcript, Vol. II, page 19.

2. CAPITAL BANK acquired all of the stock of CAPITAL FACTORS, INC.'s predecessor. Trial Transcript, Vol. II, page 20.

3. The acquisition of CAPITAL FACTORS, INC.'s predecessor took place in or about May of 1985. Deposition of Stephen N. Ashman at 8 (Sept. 1, 1989); Exhibits 66, 67 and 69 to Deposition of Stephen N. Ashman (Sept. 1, 1989).

4. At all times since 1985, Abel Holtz has been Chairman of the Board of Directors and President of CAPITAL BANK and Chairman of the Board of Directors of CAPITAL FACTORS, INC. Exhibits 66, 67 and 69 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Deposition of Stephen N. Ashman at 8 (Sept. 1, 1989).

5. At all times relevant to this litigation, Abel Holtz, Simon Portnoy, and Daniel Holtz were all members of the Board of Directors of CAPITAL BANK, as well as of CAPITAL FACTORS, INC. Exhibits 66, 67 and 69 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Testimony of Eric Moss, Trial Transcript, Vol. I, page 28.

6. The loan committee at CAPITAL BANK was comprised of Abel Holtz and Simon Portnoy, who were also members of the Board of Directors of CAPITAL FACTORS, INC. Exhibits 13, 66, 67, and 69 to Deposition of Stephen N. Ashman (Sept. 1, 1989).

7. All increases in the level of advances by CAPITAL FACTORS, INC. to its clients, including JARAX, were approved by Abel Holtz and Simon Portnoy, two senior officials of CAPITAL BANK. The tax benefits and losses of CAPITAL FACTORS, INC. were utilized by CAPITAL BANK in its income tax and other financial statements. Deposition of Stephen N. Ashman at 45–51 (Sept. 1, 1989).

8. The line of credit extended by CAPITAL BANK to CAPITAL FACTORS, INC. was the sole source of financing for CAPITAL FACTORS, INC. Deposition of Eric Moss at 35, 38. (March 1, 1989); Testimony of Eric Moss, Trial Transcript, Vol. I, page 27.

9. At all times after its acquisition by CAPITAL BANK, CAPITAL FACTORS, INC. pledged all of its assets to CAPITAL BANK as collateral for the line of credit extended by CAPITAL BANK to CAPITAL FACTORS, INC. Deposition of Eric Moss at 39–41 (March 1, 1989); Deposition of Stephen N. Ashman at 82–6 (Sept. 1, 1989); Testimony of Eric Moss, Trial Transcript, Vol. I, pages 29–31.

10. CAPITAL FACTORS, INC. established two bank accounts at CAPITAL BANK: a disbursement account and an operating account, and on a daily basis, utilized the funds that came into CAPITAL FACTORS, INC. in two formats. In connection with those accounts, CAPITAL FACTORS, INC. did two things every day (1) either paid down the line of credit with CAPITAL BANK; or (2) drew down the line of credit with CAPITAL BANK. Testimony of Eric Moss, Trial Transcript, Vol. I, pages 34–35; Deposition of Eric Moss at 36–7. (March 1, 1989).

11. CAPITAL FACTORS, INC. kept negligible balances in the CAPITAL BANK account except at the end of the month, so that its balance sheet would show a positive cash position. Testimony of Eric Moss, Trial Transcript, Vol. I, page 34; Deposition of Eric Moss at 36. (March 1, 1989).

12. All of the bank accounts of CAPITAL FACTORS, INC. were maintained at CAPITAL BANK. Testimony of Eric Moss, Trial Transcript, Vol. I, pages 32–33. CAPITAL BANK paid no interest on those accounts at any time. Deposition of Eric Moss at 37. (March 1, 1989).

13. The close financing arrangement between CAPITAL FACTORS, INC. and CAPITAL BANK was unique, and was not customary in the factoring industry. Deposition of Eric Moss at 38–39. (March 1, 1989).

14. The line of credit extended by CAPITAL BANK to CAPITAL FACTORS, INC. increased to a total of $40,000,000.00 within one year of the acquisition of CAPITAL FACTORS, INC. by CAPITAL BANK. Deposition of Eric Moss at 41–43 (March 1, 1989); Deposition of Stephen N. Ashman at 77–81 (Sept. 1, 1989).

15. Without the line of credit extended to CAPITAL FACTORS, INC. by CAPITAL BANK, CAPITAL FACTORS, INC. had no other capital to carry on its business after its acquisition by CAPITAL BANK. Exhibit 13 to Deposition of Stephen N. Ashman; Minute book of CAPITAL FACTORS, INC. (financial statements portion); Exhibits 14, 15, 18, 19, 20, 21, 22 to

Deposition of Stephen N. Ashman (Sept. 1, 1989).

16. On May 10, 1985, the date CAPITAL BANK acquired CAPITAL FACTORS, INC., CAPITAL FACTORS, INC. had a negative net worth. Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Minute book of CAPITAL FACTORS, INC.; CAPITAL FACTORS, INC. balance sheet dated May 10, 1985.

17. CAPITAL BANK infused capital into CAPITAL FACTORS, INC. to cover operating losses of CAPITAL FACTORS, INC. during the years 1985, 1986, and 1987. Exhibits 13, 14, 15, 18, 19, 20, 21, 43, 44, 45, 46, 47 to Deposition of Stephen N. Ashman (Sept. 1, 1989).

18. In December, 1985, CAPITAL BANK made a capital contribution of $500,-000.00 to CAPITAL FACTORS, INC., reducing CAPITAL FACTORS' negative net worth to $10,663.00. Exhibit 43 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Excerpted minutes of Board of Directors meeting of CAPITAL BANK on December 12, 1985.

19. At a meeting of the Board of Directors of CAPITAL BANK held on January 23, 1987, the Board of Directors of CAPITAL BANK discussed the need to invest additional capital in CAPITAL FACTORS, INC. as a result of operating losses during 1986. At the end of December, 1986, CAPITAL FACTORS, INC. showed a negative net worth of $200,-000.00. As a result of that meeting, CAPITAL BANK infused an additional $1,000,-000.00 in CAPITAL FACTORS, INC. Exhibit 46 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Excerpted minutes of meeting of Board of Directors of CAPITAL BANK held January 23, 1987.

20. At a meeting of the Board of Directors of CAPITAL BANK held on December 17, 1987, the Board of Directors of CAPITAL BANK voted to indemnify CAPITAL FACTORS, INC. for $4.2 million of accounts receivable charged off during 1987. After the $1.7 million tax effect of this indemnification, CAPITAL BANK would pay CAPITAL FACTORS, INC. $2.5 million. CAPITAL BANK then infused an additional $2.5 million into CAPITAL FACTORS, INC. Exhibit 47 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Excerpted minutes of meeting of Board of Directors of CAPITAL BANK held December 17, 1987.

21. At all times between May 10, 1985 and December 31, 1985, CAPITAL FACTORS, INC. had a negative net worth. Exhibit 13 to Deposition of Stephen N. Ashman; Minute book of CAPITAL FACTORS, INC.; CAPITAL FACTORS balance sheets dated May 31, 1985, June 30, 1985, July 31, 1985, August 31, 1985, September 30, 1985, October 31, 1985, November 30, 1985, December 31, 1985; Exhibit 5 to Deposition of Eric Moss (March 1, 1989).

22. On November 20, 1986, at a meeting of the Board of Directors of CAPITAL BANK, Abel Holtz discussed a foreclosure on the assets of Green Machine, an account of CAPITAL FACTORS, INC. and advised the Board members that in order to proceed with the action it was necessary that CAPITAL FACTORS, INC. post a $2,900,-000 bond to protect CAPITAL FACTORS, INC.'s interests. Senator Stone offered a motion that management of CAPITAL FACTORS, INC. be authorized to prepare the necessary documentation to apply for a court bond, and the Board of Directors of CAPITAL BANK approved this motion. Exhibit 45 to Deposition of Stephen N. Ashman (Sept. 1, 1989). (Excerpted minutes of meeting of Board of Directors of CAPITAL BANK held November 20, 1986.)

23. As of December 31, 1986, CAPITAL FACTORS, INC. had a negative net worth. Exhibit 18 to Deposition of Stephen N. Ashman (Sept. 1, 1989).

24. CAPITAL FACTORS, INC. lost money in 1987. Exhibits 22 and 47 to Deposition of Stephen N. Ashman (Sept. 1, 1989).

25. At all times between May, 1985 and December, 1987, CAPITAL FACTORS, INC. had either (1) a negative net worth; or (2) a sporadically positive net worth. Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989). (Minute book of

CAPITAL FACTORS, INC.); Exhibits 13, 14, 15, 18, 19, 20, 21, 22 to Deposition of Stephen N. Ashman (Sept. 1, 1989).

26. The balance sheets of CAPITAL FACTORS, INC. were changed by CAPITAL BANK to fit into CAPITAL BANK's overall financial and tax picture. Deposition of Eric Moss at 57–9 (March 1, 1989); Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989) (Note 4 to Balance Sheet of CAPITAL FACTORS, INC. dated May 10, 1985.

27. Nearly every credit that was approved by CAPITAL FACTORS, INC. while Eric Moss was President then had to be approved by CAPITAL BANK. Testimony of Eric Moss, Trial Transcript, Vol. I, page 73.

28. The minute book of CAPITAL FACTORS, INC. was not maintained on the premises of CAPITAL FACTORS, INC., but was maintained with Stephen N. Ashman on the premises of CAPITAL BANK. Deposition of Eric Moss at 62 (March 1, 1989); Deposition of Stephen N. Ashman at 86 (Sept. 1, 1989).

29. After May 21, 1985, no annual meeting or any other meeting of the shareholders of CAPITAL FACTORS, INC. was held. In addition, no written consent made by the shareholders of CAPITAL FACTORS, INC. for any purpose exists for any date after May 21, 1985. Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Minute book of CAPITAL FACTORS, INC.

30. No member of the Board of Directors of CAPITAL FACTORS, INC. ever voted against Abel Holtz at any time. Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Minute Book of CAPITAL FACTORS, INC.; Deposition of Stephen N. Ashman at 73–4 (Sept. 1, 1989).

31. CAPITAL BANK loaned employees to CAPITAL FACTORS, INC. or directly to clients of CAPITAL FACTORS, INC., including Jarax, as necessary to enable CAPITAL FACTORS, INC. to operate. Deposition of Eric Moss, at 43–5 (March 1, 1989).

32. The logo of CAPITAL FACTORS, INC. is identical to the logo of CAPITAL BANK.

33. The yellow pages listing of CAPITAL FACTORS, INC. is under the heading for CAPITAL BANK. Exhibit 61 to Deposition of Stephen N. Ashman (Sept. 1, 1989).

34. The internal telephone directory of CAPITAL BANK lists CAPITAL FACTORS, INC. as a loan department of CAPITAL BANK. Exhibit 44 to Deposition of Eric Moss (March 1, 1989).

35. The directors and executives of CAPITAL FACTORS, INC. took their directions exclusively from the parent. Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Minute book of CAPITAL FACTORS, INC.; Exhibits 43, 44, 45, 46 and 47 to Deposition of Stephen N. Ashman (Sept. 1, 1989); excerpted minutes of meetings of Board of Directors of CAPITAL BANK.

36. The financial statements of CAPITAL BANK were consolidated with those of CAPITAL FACTORS, INC. for income tax and financial reporting purposes. Deposition of Stephen N. Ashman at 45–51 (Sept. 1, 1989); Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Note 4 to Balance Sheet of CAPITAL FACTORS, INC. dated May 10, 1985.

37. All employees of CAPITAL FACTORS, INC. were required to maintain a bank account at CAPITAL BANK, into which their salaries were direct-deposited. Deposition of Eric Moss at 49 (March 1, 1989); Transcript of Trial, Vol. II, page 21.

38. All employee health benefits, workers compensation benefits and all other forms of employee insurance were paid for and maintained by CAPITAL BANK both for CAPITAL BANK's employees and CAPITAL FACTORS, INC.'s employees. Deposition of Eric Moss at 49 (March 1, 1989). Pension plans for both CAPITAL FACTORS, INC. and CAPITAL BANK were paid for by Capital Bancorp. Deposition of Stephen N. Ashman at 27–8 (Sept. 1, 1989).

39. The employment and salary levels of all persons hired by CAPITAL FACTORS, INC. were set and approved by CAPITAL BANK employees, except for Eric Moss. Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Minute book of CAPITAL FACTORS, INC.—Exhibit D to minutes, CAPITAL FACTORS Board of Directors meeting, June 20, 1985; Minutes, CAPITAL FACTORS Board of Directors Meetings, August 20, 1985; October 17, 1985; December 9, 1985; February 25, 1986; November 30, 1987; Deposition of Eric Moss at 48–49 (March 1, 1989).

40. CAPITAL BANK was required to approve all hiring requests made by the president of CAPITAL FACTORS, INC. Deposition of Eric Moss at 48–49 (March 1, 1989).

41. CAPITAL FACTORS, INC. could extend credit to its clients in excess of $150,000.00 only upon approval by CAPITAL BANK's loan committee. Exhibit 13 to Deposition of Stephen N. Ashman (Sept. 1, 1989); Minute book of CAPITAL FACTORS, INC.; Minutes of August 20, 1985; October 17, 1986.

42. The parent so dominated the subsidiary that it had no mind or existence of its own.

## II. CONCLUSIONS OF LAW

■ The law of alter ego with respect to parent-subsidiary relationships in Florida is set forth in *Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So.2d 1114 (Fla.1984) and is not identical to the general law regarding piercing the corporate veil.

■ The *Dania Jai–Alai* case sets forth a two pronged test to determine whether a corporate veil may be pierced in situations where there is a parent-subsidiary relationship. The first prong is demonstration that the subsidiary is the mere instrumentality of the parent. Factors to be considered include:

1. Whether the parent owns all or a majority of the stock in the subsidiary.

2. Whether the parent and subsidiary have common directors or officers.

3. Whether the parent subscribes to all of the capital stock of the subsidiary.

4. Whether the parent finances the subsidiary.

5. Whether the subsidiary has grossly inadequate capital.

6. Whether the subsidiary has any business except with the parent, or any assets except those conveyed to it by the parent.

7. Whether formal legal requirements of the subsidiary are not observed.

8. Whether directors or executives of the subsidiary do not act independently in the interest of the subsidiary, but take direction from the parent.

9. Whether the parent, in its papers or through its officers, makes reference to the subsidiary as a department or division.

10. Whether the parent pays the salaries, expenses or losses of the subsidiary.

See also, *Church of Scientology of California v. Blackman*, 446 So.2d 190, 193 (Fla. 4th DCA 1984); *Dania Jai–Alai Palace, Inc. v. Sykes, supra*; *Sisk v. General Builders Corporation of Fort Lauderdale, Inc.*, 438 So.2d 65 (Fla. 4th DCA 1983); *Vantage View, Inc. v. Bali East Development Corporation*, 421 So.2d 728 (Fla. 4th DCA 1982). *See also United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 691, 692 (5th Cir.1985); *Plumbers Local Union No. 519 of Miami, Florida v. Service Plumbing Co., Inc.*, 401 F.Supp. 1008, 1013 (S.D.Fla.1975).

The testimony and documentary evidence is clear and without doubt that the criteria of prong one has been met.

■ The second prong of the *Dania Jai–Alai* test requires a showing of some improper conduct. Such a showing can be made by evidence demonstrating that the subsidiary was organized or maintained to mislead creditors, or to circumvent a statute or to fraudulently avoid liability. Because of the financial structure of CAPITAL FACTORS, INC., no customer of CAPITAL FACTORS, INC. would ever have a means by which to recover any reserves which CAPITAL FACTORS, INC. would ostensibly hold. Further, no credi-

tor could ever obtain relief against CAPITAL FACTORS, INC. The court recognizes that it is not improper for a corporation to try to protect its assets. The use of a corporation has long been recognized as a lawful means of limiting liability. However, to retain the corporate veil, there must be some independence and something at risk. Creditors of the subsidiary must not be misled as to with whom they are dealing or upon whom they are relying. Here CAPITAL BANK has used CAPITAL FACTORS, INC. as a means to engage in financial dealings which may be prohibited to it under banking law and which clearly misleads the public and the creditors of CAPITAL FACTORS, INC. Still the bank seeks all the benefits of limited liability without assuming any of the burdens. In this case, CAPITAL BANK has total control over the assets and accounts of its subsidiary, CAPITAL FACTORS, INC. The parent, at its whim, can make a determination as to how much its subsidiary would have in assets or in its accounts on any particular day. This is a practice which is not appropriate and which clearly misleads creditors. If the argument is made that this was merely a bookkeeping device to maximize interest accruals and the subsidiary could pull back transfers from the parents treasury at will for the benefit of creditors, then issue of this case is moot. If that position is not adopted, then it is obvious that the parent intended to use this scheme to defeat any opportunity of legitimate creditors of the subsidiary to pursue their claims. The fine line of good business practice has been crossed and the evidence and testimony demonstrate that the requisite proof of improper conduct has been met.

Given the evidence of control and domination of CAPITAL FACTORS, INC. by CAPITAL BANK and sufficient evidence of improper conduct, the court concludes that two of the three elements necessary to establish that CAPITAL FACTORS, INC. is the alter ego of CAPITAL BANK, have been proven. The matter shall now be set for further trial as to Count I, on the issue of whether or not the conduct alleged, proximately caused injury to the plaintiff and the amount thereof and on the other Counts of the complaint.

It is ORDERED that given the evidence of control and domination of CAPITAL FACTORS, INC. by CAPITAL BANK, and sufficient evidence of improper conduct, this court concludes that CAPITAL FACTORS, INC. is the alter ego of CAPITAL BANK for the purposes of this litigation. The issue of damages to plaintiff and the amount thereof is not decided herein, and will be decided at another trial.

DONE and ORDERED.