**CARNIVAL CRUISE LINES, INC.; and Carnival Maritime, Inc., Plaintiffs,**

v.

**OY WARTSILA AB; and Valmet Oy, Defendants.**

**No. 90–1755–CIV.**

United States District Court, S.D. Florida.

Oct. 19, 1993.

William F. Hamilton, Holland & Knight, Miami, FL, Lewis Clayton, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs.

Barry Davidson, Miami, FL, Michael Jaffe, Gerald Zingone, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, David L. Ross, Greenberg Traurig Hoffman Lipoff Rosen & Quentel, Miami, FL, for defendants.

## ORDER OF DISMISSAL

MARCUS, District Judge.

THIS CAUSE comes before the Court upon the motions filed on February 7, 1992 by Defendants Oy Wartsila Ab ("Wartsila") and Valmet Oy ("Valmet") to dismiss the amended complaint filed by Plaintiffs Carnival Cruise Lines, Inc. and Carnival Maritime, Inc. (collectively, "Carnival"). *See* Docket Entry Nos. 210, 215. For the following reasons, we GRANT the motions to dismiss pursuant to the doctrine of *forum non conveniens.*

### I.

Carnival Cruise Lines, Inc. is a Panamanian corporation headquartered in Miami, Florida, and is alleged to be successor-in-interest to Carnival Maritime, Inc., a now-dissolved Panamanian corporation. Wartsila is a Finnish corporation headquartered in Finland.[1] Valmet is a Finnish corporation also headquartered in Finland, and is 80%-owned by the government of Finland.

Carnival filed this action in state court on June 22, 1990 (service was perfected on June 28, 1990) and Defendants removed it to federal court on July 24, 1990. On December 27, 1990, Carnival filed its four-count amended complaint sounding in fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), Florida civil theft (Count III), and civil conspiracy (Count IV), seeking to pierce the corporate veil of the subsidiary corporation with which Carnival contracted, Wartsila Marine Industries, Inc. ("Marine"), by alleging that the subsidiary was, in practice, the "alter ego" of the Defendants, and demanding $400 million in compensatory damages, $300 million in punitive damages, trebling as appropriate, costs and fees. The gravamen of the complaint is the allegation that Defendants fraudulently in-

---

1. Subsequent to the filing of this action, Wartsila merged with a third corporation to form a new company, Metra Oy. Carnival has moved to substitute Metra for Wartsila, and that motion is hereby GRANTED. For the purposes of this discussion, however, we shall refer to Wartsila by its previous incarnation.

duced Carnival to enter into a contract with an undercapitalized subsidiary, which agreement was subsequently breached, for the construction of three luxury cruise ships by misrepresenting the financial strength of the subsidiary.

The controversy as alleged by the amended complaint can be briefly summarized as follows. In late 1986, Carnival, which is in the business of operating luxury cruises, and Defendants, which were in the business of building ships, began negotiations for the construction of a new luxury oceanliner, the *Fantasy*. During negotiations, Defendants told Carnival that as of January 1987, their shipbuilding operations would be merged into a new subsidiary corporation, Marine, which would be owned 30% by Valmet and 70% by Wartsila. Carnival then sought a parent guarantee from Defendants that the contract would be completed. Defendants allegedly rejected this idea, emphasizing the robust capitalization of Marine. To reassure Carnival, Wartsila faxed a "comfort letter"—allegedly signed by Tor Stolpe, the president of Wartsila on behalf of both Wartsila and Marine as well as by a Valmet representative, *see* Am. Compl. Ex. A, and accompanied by a "transmittal" cover sheet signed by Tim Lehto, counsel for Wartsila—to Carnival detailing the capitalization of Marine. Relying on these representations and others, in January 1987 Carnival closed the *Fantasy* contract, and shortly thereafter accepted an option agreement for the construction of another ship. Later that year, Carnival exercised that option and also agreed to purchase a third ship. Those two ships were later named *Ecstasy* and *Sensation*.

All three contracts were subsequently breached when Marine declared bankruptcy in October 1989 without having delivered any of the ships. The *Fantasy* and the *Ecstasy* were partially completed, and the *Sensation*, not at all. Carnival then paid another Finnish shipbuilding concern to complete the ships at additional cost, and now sues to recover the cost of cover and consequential lost bookings resulting from the late delivery.

Presently, Marine is being liquidated in a Finnish bankruptcy proceeding. Carnival has filed a claim as a creditor of Marine in that proceeding for compensatory and consequential damages arising out of the breach of the three contracts. Carnival's filing was contested by the Trustees of Marine and by Wartsila. Consequently, Carnival filed what is called a "confirmatory" action against Wartsila which will determine the validity of Carnival's claim by a full adversarial trial as part of the bankruptcy proceeding. *See* Liljestrom Supp. Aff. at 11–12. As a further component of the Marine bankruptcy proceedings, the Trustees of the debtor—on behalf of all creditors of Marine, including Carnival— have sued both parent corporations, Valmet and Wartsila, in their capacity as shareholders of Marine, for damages in excess of FIM 2.75 billion arising out of the alleged undercapitalization of Marine. *See* Liljestrom Supp. Aff. at 13. The Trustees' suit alleges various claims in contract and tort, including the Finnish counterpart of fraud and misrepresentation, conspiracy, violation of fiduciary duties and the Finnish General Corporation Law, and liability of the parent corporations on an "alter ego" theory based primarily on Marine's alleged undercapitalization. *See* Liljestrom Supp. Aff., Extract at 18–22 (copy of complaint by Trustees of Marine against Valmet Oy).

The amended complaint charges that the January 26, 1987 comfort letter was false because it stated Marine's net worth as FIM 1.5 billion (approximately $300 million) when in fact—as a result of the transfer of unprofitable contracts and other liabilities, as well as the overvaluation of real estate, equipment, executory contracts and accounts receivable—Marine's true worth was far less. *See* O'Toole Aff. ¶ 5(a) ("Wartsila Marine was worth only a third of its stated equity."). Carnival also claims that Marine's initial cash capitalization was really a transfer of vastly overvalued assets; that is, Plaintiffs theorize that Defendants' infusion into Marine of FIM 1.5 billion immediately followed by Marine's purchase of shipbuilding assets from the Defendants for FIM 1.5 billion was a "sham"

since the assets were secretly valued by Defendants at only FIM 500 million.

Further, relying on an investigation by independent auditors Deloitte & Touche, Carnival contends that bank transfer receipts from the initial capitalization show that, despite the contrary representation in Marine's various disclosure documents, Marine was actually capitalized not by cash, but by the transfer of assets. Carnival alleges that the cash transfers were designed to evade the provisions of the Finnish Companies Act which requires, among other things, that a reliable appraisal be performed where a corporation is capitalized by contribution of assets, and that the directors satisfy themselves in good faith that the assets correspond to the stated value. *See* Am. Comp. ¶ 23; *see also* Luostarinen Aff., ¶ 4; Nuolimaa Aff. ¶¶ 5, 19–20. Defendants vigorously protest Carnival's view of the capitalization transaction, and reject the notion that Finnish law contains an appraisal requirement.

Carnival also alleges that the mandatory disclosure statement which Marine filed with the Finnish Trade Registry on January 12, 1987 was false on its face in representing that the new corporation had FIM 1.5 billion paid-in capital, when in fact the cash had been immediately retransferred out prior to the Trade Registry filing. Defendants reply that Finnish law (as interpreted by Jukaa Luostarinen, a Finnish attorney) does not require that the cash be on hand at the time of the Registry filing. Further, one of their experts on Finnish law contends that "[t]he [Finnish] Companies Act allows the company to disburse the funds immediately upon receipt for any legitimate purpose." Luostarinen Aff. at ¶ 5.

By its instant motion, Valmet moves to dismiss the amended complaint for lack of subject-matter jurisdiction based on sovereign immunity, pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601–11; lack of personal jurisdiction based on Carnival's inability to demonstrate a prima facia case that Marine was the alter-ego of Valmet so that Marine's conduct could give rise to specific personal jurisdiction over Valmet; and *forum non conveniens.* Similarly, Wartsila moves to dismiss for lack of general or specific personal jurisdiction based on Wartsila's contacts with the forum; failure to make a prima facie showing that Marine was Wartsila's alter ego so that specific personal jurisdiction could be asserted on that ground; and *forum non conveniens.*

Even if this Court can properly exercise jurisdiction over the Defendants in this action—and as we observe below, the assertion of jurisdiction over the defendant Valmet pursuant to the FSIA is a close question—we find that entertaining this lawsuit in this forum would be improper under the doctrine of *forum non conveniens.*[2]

At the heart of this case lie the interrelated questions of whether Marine was undercapitalized, whether it was otherwise improperly formed by the merger of Defendants' shipbuilding operations, and whether its true worth was misrepresented to Carnival in order to induce Carnival to forego securing a parent guarantee of the three construction contracts. These questions will turn on the application of Finnish corporate law, Finnish corporate reporting requirements and Finnish accounting principals to the events surrounding the forma-

---

**2.** All parties have analyzed this question as a matter of federal law, rather than Florida law, which continues to reject the doctrine of *forum non conveniens. See Alco Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147, 155 n. 10 (2d Cir.) ("[a]pparently the only state where the court of last resort has continued to reject the doctrine [of *forum non conveniens* ] as a matter of common law is Florida"), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980); *Houston v. Caldwell,* 359 So.2d 858 (Fla.1978); *Nat. Aircraft Serv., Inc. v. New York Airlines, Inc.,* 489 So.2d 38, 39 (Fla. 4th DCA 1986). In this Circuit,

"[t]he *forum non conveniens* doctrine is a rule of venue, not a rule of decision," and thus the federal brand of the doctrine must be applied in this case. *Sibaja v. Dow Chemical Co.,* 757 F.2d 1215, 1219 (11th Cir.), *cert. denied,* 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985). The common-law incarnation of the doctrine of *forum non conveniens* is to be applied where the alternate forum is a forum country. *See Miskow v. Boeing Co.,* 664 F.2d 205, 207 (9th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982).

tion of Marine and the negotiation of the three shipbuilding agreements. Central to the resolution of these basic questions will be consideration of testimony and documents regarding the method of the valuation of the assets and liabilities of the new entity, and whether Defendants undertook such valuation in good faith. One of the most fundamental issues to be decided—namely whether an independent appraisal would have made any difference in the valuation of the shipyard assets—would require this Court to value real property and heavy equipment of shipyards located in Finland, joint ventures in Finland, as well as a host of receivables and executory contracts for Finnish projects. Thus, the central issue of the motion before the Court is whether these problems of determining and applying Finnish corporate law and accounting principals are so formidable that it would be fair to send a company which—despite its Panamanian incorporation—is essentially American, to litigate its case overseas.

## II.

■ The United States Court of Appeals for the Eleventh Circuit has set out the following framework for this analysis:

> As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing a plaintiff's initial forum choice. If the trial judge finds this balance of private interests at or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Pain v. United Technologies Corp.*, 637 F.2d 775, 784–85 (D.C.Cir.1980) (emphasis

in original), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). A plaintiff who chooses a foreign forum substantially undercuts the presumption his choice is reasonable: "[b]ecause the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981) (footnote omitted).

Since the touchstone of *forum non conveniens* analysis is convenience, controlling weight cannot be given to any one factor in the balancing process or the doctrine would lose much of the flexibility that is its essence. *Piper Aircraft*, 454 U.S. at 249, 102 S.Ct. at 262. The Supreme Court has indicated that, in considering the private interests of the litigants, some important considerations are: relative ease of access to sources of proof; ability to obtain witnesses; possibility of view of premises, if relevant; and "all other practical problems that make trial of a case easy, expeditious and inexpensive." [*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).] The Court also listed certain public interest factors bearing upon the forum's interest in entertaining the lawsuit: court congestion and jury duty generated by controversies having no relation to the forum; the desirability of having localized controversies decided at home; and the difficulties attendant resolving conflict-of-laws problems and applying foreign law. *Id.* at 508–09, 67 S.Ct. at 843. It is evident that these lists were not intended to be exhaustive, but merely to suggest the range of relevant considerations.

*La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir.1983).

■ Thus, the threshold issue the Court must decide in resolving a *forum non conveniens* motion is whether an adequate alternative forum exists. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 265 n. 22, 70 L.Ed.2d 419 (1981). Defendants point to Finland as the suitable

alternative forum. To rebut this point, Carnival argues that it would be deprived of its remedies in a Finnish court, and therefore dismissal under *forum non conveniens* would be inappropriate. *See* Pl. Opp.Memo. at 98. In support of this argument, Plaintiff contends that (1) pretrial discovery is unavailable under Finnish civil procedure; (2) Finnish courts do not recognize the theory of piercing the corporate veil; (3) Finland does not recognize conspiracy claims; (4) punitive damages are unavailable in Finland; and (5) Carnival would not receive a jury trial in Finland. *See id.* at 99–100. We conclude that Finland would provide a suitable alternative forum, and address each of Plaintiff's concerns seriatim.

■ At the outset we note that this preliminary "suitability" question is not a high hurdle. As the Supreme Court has observed,

> Ordinarily, this requirement will be satisfied when the defendant is "amenable to process" in the other jurisdiction. *Gilbert*, 330 U.S., at 506–07, 67 S.Ct. at 842. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute.

*Piper Aircraft*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22. Defendants, both Finnish corporations, stipulate that they are subject to the jurisdiction of the Finnish courts and are currently defending the action in Finland by the Marine Trustees.[3] In addition, Wartsila is already defending the "confirmatory" action by Carnival in the Finnish Marine bankruptcy case. The guaranty of Finnish jurisdiction over the defendants is alone a sufficient basis to conclude that the Finnish forum is adequate.

■ In any event, Plaintiff's reasons in support of its contention that the remedy available in Finland is "clearly inadequate" are unpersuasive. In addressing Plaintiff's reasons, we are guided by the ruling of the Court of Appeals for the Eleventh Circuit that the remedy abroad need not be equivalent to that offered by a domestic court:

> The Supreme Court rejected the usual canard offered by courts in refusing dismissals. It is no longer sufficient to retain jurisdiction simply because the remedy available in an alternative forum is less substantively generous. [*Piper Aircraft*, 454 U.S.] at 249–55, 102 S.Ct. at 262–66. Unless the other nation affords a remedy "so clearly inadequate that it is no remedy at all," substantial weight *may not be given to this consideration. Id.* at 251, 102 S.Ct. at 263.

*Sigalas v. Lido Maritime, Inc.*, 776 F.2d at 1512 (1985).

■ First, Carnival claims that there is no pretrial discovery in Finland. In support of this contention, Carnival offers the affidavit of Mikko Tulokas, former Finnish counsel for Carnival, who is currently sitting on the Supreme Court of Finland. This formidable expert testifies that

> pretrial discovery is not permitted in Finland. Carnival would not be able to obtain the tens of thousands of documents I understand were produced by Wartsila and Valmet in the Florida proceedings, nor any of the deposition testimony taken of Wartsila, Valmet and third-party witnesses, if it pursued its claims in the Finnish courts. I understand that Wartsila and Valmet requested that discovery materials in this case be kept confidential and used only in this litigation, precisely because pretrial discovery is unavailable in Finland.

Tulokas Aff., ¶ 5. The affidavit of Valmet's Finnish counsel, Robert Liljestrom, however, discusses Finnish pretrial proce-

---

**3.** None of the parties have raised the question of whether the statute of limitations will have run on a Finnish cause of action. In any event, as the motion to dismiss on *forum non conveniens* grounds is joined by all Defendants, Defendants are deemed to have waived any limitations or jurisdictional defenses in any subsequent Finnish litigation arising out of these events. *See generally, Danser v. Firestone Tire & Rubber Co.,* 86 F.R.D. 120, 124 (S.D.N.Y.1980).

dure in greater detail and leads us to the conclusion that Carnival would not be entirely foreclosed from pretrial discovery in Finland.

Mr. Liljestrom contends that "Plaintiffs' understanding that pretrial discovery is unavailable under Finnish civil procedure is not correct." Liljestrom Aff. ¶ 12. Of particular note is Liljestrom's observation that Finnish civil procedure, which is currently a one-stage system, is presently undergoing structural changes, and that "a two-staged [pretrial and trial] system similar to that of the United States and many other countries will be fully introduced effective December 1, 1993." Liljestrom Aff. ¶ 11. Under the present scheme, "[s]ection 10 of chapter 17 of the Finnish Code of Procedure provides means for obtaining and securing evidence prior to a trial, but this pre-trial discovery procedure is generally regarded as impractical and therefore it is seldom used." *Id.* Liljestrom explains that the salient difference between Finnish and U.S. pretrial process is that the latter is far more liberal, and the former "requires that the court determine[ ] the need for the information in evidence before ordering its disclosure." *Id.* at ¶ 13. Despite this limitation, this particular litigation may engage broader discovery than usual in Finland, since, as Liljestrom testifies,

> I am in the possession of a written consent of the Trustees of [Marine] providing free access to the files of [Marine] to search for evidence. I understand that an equivalent consent has been issued to the Plaintiffs. Thus, apart from information held by the Defendants, the major source of information is open for discovery.

*Id.* at ¶ 16; *see also* Pl. Memo. in Further Opposition to Motion to Dismiss [hereinafter "Pl. Surreply"], at 41 ("Defendants ...—like Carnival—have open access to the files of Wartsila Marine."). In sum, "Plaintiffs would have to go about [discovery] differently, in particular argue the relevance of evidence sought before rather than after obtaining it. The difference as experienced in this action is in practical terms not substantial." *Id.* at ¶ 17.

Finland's somewhat more restrictive discovery procedures will not render it an inadequate forum. We are not alone in reaching this conclusion, *see Lockman Foundation v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir.1991) (more restrictive Japanese discovery procedures did not render Japan an inadequate forum), nor is it improper to weigh the competing opinions of experts in assessing foreign law. *See Cheng v. Boeing Co.*, 708 F.2d 1406, 1410 (9th Cir.), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983).

Moreover, we fully expect that Defendants will continue to provide the records relevant to Plaintiffs' claims as contemplated by the Federal Rules of Civil Procedure, and that Plaintiffs will reciprocate. *See generally, Piper Aircraft*, 454 U.S. at 257 n. 25, 102 S.Ct. at 267 n. 25 ("In the future, where similar problems are presented, district courts might dismiss subject to the condition that defendant corporations agree to provide the records relevant to the plaintiff's claims."); *In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195, 205 (2d Cir.) (directing reciprocal discovery governed by the Federal Rules as a modified condition of district court's dismissal on *forum non conveniens* grounds), *cert. denied*, 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987); *Danser*, 86 F.R.D. at 124 (conditioning dismissal on defendant's production of all reasonable discovery requests).

■ Next, Carnival claims that the concepts of conspiracy and piercing the corporate veil are not recognized by Finnish law. Carnival wishes to rely on the former theory to hold Valmet liable for its knowledge of and participation in the allegedly fraudulent comfort letter transmitted to Carnival by Wartsila; and Carnival seeks to use the latter approach to hold Wartsila and Valmet responsible for the statements and commitments made by representatives of Marine. In support of its evaluation of Finnish law, Carnival again submits the affidavit of Mr. Tulokas who states flatly that "Finland would not recognize Carnival's conspiracy claim," Tulokas Aff. ¶ 8, that the concept of piercing the corporate

veil "would not be available" in a Finnish court, and that such a theory is not asserted in the Trustee's lawsuit, Tulokas Aff. ¶ 5, 7.

As to the concept of "conspiracy," it appears that Mr. Tulokas's solid pronouncement is softened by a more thorough translation of legal terms. Mr. Liljestrom observes that there is liability for civil "consorted action" in Finland:

"Conspiracy" as a term and concept is in Finnish law exclusively reserved for certain criminal conduct against the State (Criminal Act chapter 11). Other forms of joint action or activity resulting in a civil harm or criminal violation is in Finnish law termed "consorted action", which pursuant to section 2 of chapter 5 of the 1974 Torts Act results in joint and several liability. The Finnish civil concept of consorted action does not require that the consorted parties in all respects act jointly and identically, but that there is a common or cumulative basis which is causal to the damage or injury.... If Wartsila and Valmet were shown to hav[e] agreed on a scheme that defrauded Plaintiffs, then irrespective of which defendant actually performed the fraudulent act, both defendants would under Finnish law be jointly and severally liable for any loss or damage resulting from such scheme.

Liljestrom Aff. ¶ 25.

█ Similarly, Liljestrom explains that piercing the corporate veil has been recognized by Finnish court decisions dating back to 1929, and that a comprehensive report on the doctrine was presented at the 1984 Nordic Lawyers Meeting in Oslo. See Liljestrom Aff. at ¶¶ 21, 22. Further, our review of one of the complaints filed by the Marine Trustees against Valmet in the Finnish Marine bankruptcy proceedings reveals that the complaint is premised on precisely this notion. Specifically, that complaint alleges liability of Valmet and Wartsila on a piercing theory based on the classic common-law elements of domination and control, undercapitalization, interlocking directorates, and agency/alter-ego:

All of [Marine's] activities have been de jure and de facto dependent on decisions made by Valmet Oy and Oy Wartsila Ab.... The significance of this is that specific obligations may be imposed on Valmet Oy with regard to Marine and in particular, its creditors.

\* \* \* \* \* \*

By taking undue advantage of [Marine], which was controlled by Valmet Oy and Oy Wartsila Ab and dependent on them, Valmet Oy secured for itself a material benefit which was markedly disproportionate to what Valmet Oy ceded to [Marine]....

\* \* \* \* \* \*

The members of the Board of Directors, who were appointed by Valmet Oy, acted as Valmet Oy's representatives in the arrangements related above, participating jointly and willfully in causing the damage suffered by [Marine]. Valmet Oy bears the principal's responsibility for the damages its representatives caused to [Marine], their contracting partner.

\* \* \* \* \* \*

Valmet Oy bears the principal's responsibility for acts that disregarded its corporate and legal obligations within [Marine] and were committed by the management and personnel appointed by Valmet Oy as members of the [Marine] Board of Directors.

See Municipal Court of Helsinki Complaint (by Trustees against Valmet Oy), Liljestrom Aff. Ex. A., 19–22. See also Municipal Court of Helsinki Complaint (by Trustees against Oy Wartsila Ab), Liiri Aff., Ex. A at 10 ("Put another way, [Marine] can be considered to have been completely dependent on the authority of its shareholders in all of its activities, especially that of Oy Wartsila Ab"); id. at 23 ("[Marine], which was under the control of Oy Wartsila Ab...").

█ As to the unavailability of punitive damages, or treble damages under the Florida civil theft statute, we have already noted the directives of the Supreme Court and the Court of Appeals for the Eleventh

Circuit that unless the remedy in Finland is "so clearly inadequate that it is no remedy at all," substantial weight may not be accorded to this consideration. *Piper Aircraft*, 454 U.S. at 249, 102 S.Ct. at 263; *Sigalas*, 776 F.2d at 1512. Plaintiffs inability to recover damages beyond make-whole relief simply will not render an alternative forum inadequate. *See Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987) ("[t]hat [plaintiffs] could not get triple damages if they proved the frauds underlying their RICO claim in the Philippines is irrelevant"); *de Melo v. Lederle Laboratories*, 801 F.2d 1058, 1061 (8th Cir. 1986) (holding that Brazil not rendered an inadequate forum by plaintiff's inability to recover punitive damages there).

■ Likewise, Carnival is not deprived of a remedy by the unavailability of a jury trial in Finland. Carnival will still receive a trial of its claims on the merits in Finland. Contrary to Carnival's suggestion, *see* Pl. Opp. Memo. at 103, there is no evidence in this record which supports the proposition that trial by a Finnish judge will not be fair merely because the government of Finland (via its majority ownership of Valmet) will be an interested party, or that the Marine bankruptcy has received great publicity. *Cf.* Liljestrom Supp. Aff. ¶¶ 40, 41 ("Any form of impartiality [in favor of the government] of a court would constitute a mistrial."). *See generally, Lockman Foundation*, 930 F.2d at 768 (holding that lack of jury trials in Japan does not render Japan an inadequate forum); *Danser*, 86 F.R.D. at 122 (noting no indication that bench trial in West Germany or the Netherlands would be unfair).

■ Moreover, although "fraud" and "misrepresentation" appear to be concepts restricted to the criminal law in Finland, Liljestrom indicates that they have equiva-

lent counterparts in the civil law "found in chapter 2 (sections 28 through 38) of the Contracts Act." Liljestrom Aff. ¶ 26.[4] Accordingly, Carnival would retain a cause of action for fraud under Finnish law.

■ Finally, the existence of the Trustees' action against Wartsila and Valmet lends further support for the adequacy of the Finnish forum. As the Letter of Jukka Peltonen, the Marine Trustee, to American counsel for Carnival states, Finnish bankruptcy procedure permits Carnival to intervene in the Trustees' action (albeit not to pursue its claims to the exclusion of the other creditors): "[t]he creditors can, in some cases in which the Bankruptcy Estate is a party, have the right to appear as intervening third party, but, however, only to support the Bankruptcy Estate's claims or defenses." Liiri Aff., Ex. B at 5; *see also* Liljestrom Supp. Aff. ¶ 34 (detailing right to intervene under Finnish Code of Procedure). True, Carnival would be intervening only in its capacity as one of many creditors of the estate, but the Defendants' unrebutted explanation of Finnish procedure indicates that Carnival could also file an independent claim for fraud against Wartsila and Valmet. *See* Liljestrom Supp. Aff. ¶ 36. Such a lawsuit could apparently be *consolidated* with the Trustees' action, thus lending even further support to Carnival's ability to adequately pursue its claims in the alternate forum. *Id.* Additionally, Carnival's own failure to date to file such a claim cannot demonstrate Finland's lack of hospitality.

■ Having found that Finland would provide an adequate alternative forum, we turn next to consideration of the "private interests" of the litigants. These factors include:

> relative ease of access to sources of proof; availability of compulsory process

---

4. At first blush, the Trustees' complaint against Valmet in the Finnish bankruptcy proceeding seems to plead fraud. The complaint claims that "[f]rom the beginning of the contractual relationship, Valmet acted under an awareness of the damaging consequences of its actions to Marine and its creditors. At the same time, it attempted to obtain *unlawful unjustified benefits* for itself." *See* Municipal Court of Helsinki Complaint, Liljestrom Supp. Aff. Ex. A., at 19 (emph. supplied). Although this allegation appears itself to articulate a fraud claim, the Marine bankruptcy Trustee indicates that "the Bankruptcy Estate's actions against Wartsila and Valmet ... do not assert fraud." Liiri Aff., Ex. B at 5 (Letter from Jukka Peltonen to Lewis R. Clayton).

for attendance of the unwilling, and the costs of obtaining willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843.

To the extent that the Finnish pretrial procedure renders sources of proof less accessible, as discussed above, we are not convinced that this factor is entitled to much weight; furthermore, we expect that Defendants will continue to provide liberal discovery on the merits of this case. We recognize, however, that obtaining documents in a Finnish forum will not be much easier for Carnival's American counsel, since the documents would still require translation—no matter whether the document is produced in Miami or Helsinki. Further, compelling production of documents from Finland—although subject to delay—has not been an insurmountable obstacle to discovery in this case, and this Court has not hesitated to resort to the Hague Convention to request judicial assistance from the Finnish Ministry of Justice for forty-four categories of documents.

Carnival and Defendants clash vociferously in their appraisal of whether the important witnesses in this case can be compelled to appear in Miami. Live testimony will be indispensable in evaluating such issues as whether the Defendants exercised undue control over Marine's board of directors, whether Marine was managed in good faith, and what representations were made to Carnival during negotiations, to name only a few. Both sides agree that the lion's share of witnesses are located in Finland. Defendants point out that many of the key witnesses it will require to defend this action no longer work for the defendants and thus are non-party witnesses beyond the subpoena power of this court; in addition, Defendants contend that several work for Defendants' competitors and would be unwilling to make a voluntary trip to the United States. Carnival counters that the "truly important witnesses defendants might wish to call are under defendants' control," Pl. Surreply at 42; that from Carnival's perspective, a Helsinki trial would be equally inconvenient as a Miami trial would be to Defendants, because all of Carnival's witnesses are in Florida; that the Marine board members have already been deposed and can come to Florida for trial; and that the top former Marine executives regularly travel to Florida on business and would be willing to testify in Florida.

Beyond these disputes, we reiterate that the necessity of taking testimony from Finnish fact and expert witnesses on the question of valuing Marine's net worth at the time of its capitalization cannot be overestimated. Carnival emphasizes that one of the most crucial, if not the most crucial of issues in this case is whether the Defendants undertook the valuation of the assets transferred to Marine at the time of the merger in good faith. *See e.g.,* Tr. of Hearing before Hon. Stanley Marcus at 45–46 (January 28, 1993). As evidence of bad faith, Carnival alleges that the balance sheet which Defendants furnished to Carnival during negotiations falsely reflected Marine's total stockholder's equity as FIM 1.5 billion, when in truth the balance sheet "failed to disclose the overvalued assets and hidden losses defendants had transferred to Wartsila Marine." Am.Compl. ¶ 45. Further, Carnival claims that the representation that Marine had an equity base of FIM 1.5 billion was again made in a January 26, 1987 memorandum signed by representatives of both Wartsila and Valmet. *See* Am. Compl. Ex. A at 1; Am. Compl. ¶¶ 46–50. Carnival expressly charges that "[t]he representations in the . . . balance sheet as to Wartsila Marine's net worth, and the January 26, 1987 memo concerning the equity contributions allegedly made by [Defendants] were false." Am. Compl. ¶ 51.

Defendants specifically deny that the representations were false. *See* Valmet Answer ¶ 51 (February 5, 1991); Wartsila Answer (February 5, 1991).

If Marine's net worth was indeed FIM 1.5 billion—as Defendants' Answers contend—then it will be nearly impossible for

Carnival to prove that the Defendants undertook a bad faith valuation of assets and liabilities when they capitalized Marine. Furthermore, any discrepancy between the represented value and the actual value will materially inform the decision as to whether Defendants acted in bad faith. Determination of actual value of Marine's assets at the time of its capitalization will thus be a major element of the litigation of the core of Carnival's case.

The problem with an American forum is thus illuminated: the court must make a determination as to the value of the assets transferred to Marine by the Defendants. As described in the affidavit of Franklin O'Toole, who supervised a Deloitte & Touche audit of Marine at Carnival's behest, these assets included the entire operations of various shipyards, O'Toole Aff. ¶ 22. The assets of these shipbuilding and ship-repair yards comprised not only heavy equipment, machinery, real property and improvements thereon, inventories, and accounts receivable, *see* PX 40 [Plaintiff's deposition exhibit] at 30–35, 40 n. 27 (Oy Wartsila Ab Annual Report 1987), but also joint ventures, *see* Tr. 47 (January 28, 1993), orders for passenger ships, *see* PX 126 at 2 (Oy Wartsila Ab Annual Report 1986), ferries, *id.*, a shuttle tanker, *id.*, an ice breaker, *id.*,[5] as well as several contracts with the Soviet Union for delivery of a heavy-load carrier and two cable layers, *id.*, the prospects for profitability on which are alleged by Carnival to have been poor, *see* O'Toole Aff. at ¶ 63–66.

Even holding the need to apply Finnish accounting methods aside, in order to value real property or improvements at a certain point in time, *see* Tr. at 46 (January 28, 1993), the court must consider not only the purchase price of the land or the buildings, but also comparable items in the relevant market. The calculus simply cannot be made without the trial testimony of Finnish witnesses, both fact and expert, most of whom are beyond the compulsory subpoena power of this court, and all of whom could travel to Miami only at great expense. The same surely holds true for valuing the various joint ventures and construction orders.

Thus, from a thorough consideration of the briefing and argument on this issue, it appears that trial in Miami would be anything but expeditious and inexpensive. We recognize that despite the dire forecasts by both sides, "litigants generally manage to try their cases with fewer witnesses than they predict in such motions as this." *Gilbert*, 330 U.S. at 511, 67 S.Ct. at 844. But even viewing the potential hassles and expenses to the litigants in the light most favorable to Carnival, the inability of this Court to render an informed decision as to the true value of Marine's initial capitalization requires this controversy to be heard in Finland.

■ Beyond the patent inconvenience of this forum from the standpoint of the private interests, the public interest factors also point decidedly towards Finland. As to the first three of the factors enumerated earlier, the courts will always be and have always been congested; the controversy affects both Miami and Helsinki such that jurors in either courthouse would no doubt find it interesting; and this international dispute between global corporations involving the cross-hemispheric transmission of facsimiles and the foreign manufacture of domestic-managed cruiseships designed for transoceanic voyages is anything but a "localized controvers[y]." *Gilbert*, 330 U.S. at 509, 67 S.Ct. at 843. As mentioned above, the most salient factors for this case are "the difficulties attendant resolving conflict-of-laws problems and applying foreign law." *Id.* 330 U.S. at 508, 67 S.Ct. at 843.

■ Although the need to apply foreign law may not itself be a sufficient reason to render a *forum non conveniens* dismissal, *see Mercier v. Sheraton International, Inc.*, 935 F.2d 419, 428 (1st Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 2346, 124

---

5. Carnival contends that at least several of these shipbuilding contracts which Marine inherited from Wartsila and Valmet were priced below cost. *See* O'Toole Aff. ¶ 36. In particular, the Deloitte & Touche audit suggests that Wartsila estimated that Marine could lose between FIM 100 and FIM 200 million per passenger ship order. *Id.*

L.Ed.2d 255 (1993); *Shipping Corp. of India, Ltd. v. American Bureau of Shipping*, 603 F.Supp. 801, 806 (S.D.N.Y.1985), it is a key factor to be considered, *see e.g., Pain v. United Technologies Corp.*, 637 F.2d 775, 793 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *Shepard Niles Crane & Hoist Corp. v. Fiat S.p.A.*, 84 F.R.D. 299, 305 (S.D.N.Y.1979). At the very least, "[t]he need to resolve and apply foreign law should 'point [the trial court] towards dismissal....'" *Sigalas*, 776 F.2d at 1519 (11th Cir.) (citing *Piper Aircraft*, 454 U.S. at 249, 102 S.Ct. at 263).

An American court could decide whether the Trade Register filing was false on its face. On the other hand, whether Marine could represent that it had FIM 1.5 billion paid-in capital, when the cash had already been disbursed prior to the Trade Register filing, requires the Court to divine Finnish law. Likewise, counsel for Carnival conceded at oral argument that the analysis of the method of capitalization is squarely "an issue of Finnish law ... [t]here is no doubt about it." Tr. of Hearing at 31 (Jan. 28, 1993). Similarly, resolving whether an independent appraisal is required by the Finnish Companies Act whenever a corporation is capitalized in-kind requires this Court to construe Finnish law.

By way of example, the putative validity of the banking transaction at the Union Bank of Finland transferring the funds involved in the capitalization has been raised by the Defendants as proof that the scheme was not designed to evade Finnish reporting requirements. *See* Wartsila Memo. at 46; Valmet Mem. 13–14 n. 10. Defendants proffer the report by Finland's Banking Supervision Board finding the transaction proper as conclusive proof that the method of capitalization was proper. We cannot say that the report is the final word on the capitalization method issue, however, since it focuses primarily on whether the conduct of the Union Bank was in accordance with Finnish accounting guidelines, but does not answer the question of whether, despite a wholesome role by the Union Bank, the Defendants nevertheless manipulated the transaction to evade corporate reporting requirements. *See* Deft. Appx. I, Ex. 23 (Statement of Banking Supervision Board of Finland to Union Bank of Finland, Ltd, May 7, 1991).

Carnival argues that resolving the alter ego question will require only a determination of whether the Defendants' boards of directors acted in good faith when they valued the assets transferred to Marine upon its initial capitalization. This is only part of the story, however, since inevitably the good faith analysis will depend on the accuracy of the valuation. That issue, in turn, must be resolved by resorting to Finnish accounting principles [6] (because using American Generally Accepted Accounting Principals as the standard for comparison would surely be inapposite) and to a valuation by a court located in Miami of those assets—which are located in Finland.

More specifically, the amended complaint, ¶¶ 74–83 and Ex. B, presents the independent audit report of Tilintarkastajien Oy Revisorernas Ab (the "Audit Report") which, despite its subsequent downplay, *see* Pl. Opp. Memo. at 125, is one of two exhibits attached to the complaint. The Audit Report concludes that at the time of Marine's formation, assets—rather than "funds of the kind referred to in Chapter 2 Section 4 of the Finnish Companies Act"—were invested in Marine; and that the assets and commitments transferred were "partially overvalued[,] causing [the Marine] loss." *See* Am. Compl. Ex. B at 3 (Audit Report). The allegedly overvalued assets included unfinished constructions, overpriced shares held in another company, overvalued shipyard assets, overpriced holdings in subsidiary corporations, and "losses contained in the orders on hand." *Id.* Clearly, Finnish accounting principles are integral to the valuation of these intangibles.

---

**6.** Apparently, Marine's budgets were calculated using three different accounting bases: Finnish Generally Accepted Accounting Principles, International Accounting Standards, and Internal Reporting. *See* O'Toole Aff. ¶ 67 n. 5.

The Audit Report highlights the necessity of construing and applying Finnish accounting principles and corporate law:

> Formally the increase of share capital was treated as a stock issue, although the factual method was one of subscription in kind. Thus, the provisions of Chapter 4 Section 6 of the Companies Act were not adhered to. By this means of increasing the share capital, the Board of Directors avoided giving the statement and requesting the auditor's report required in Chapter 2 Section 4 of the Companies Act. In consequence of the above we submit that the Administrators of the Bankrupt's Estate investigate whether the law and regulations in force were disregarded when the Company was founded thus causing the new Company financial loss.

*Id.* Significantly, Defendants reject the Audit Report by producing the report of the Board of Auditors of the Central Chamber of Commerce of Finland, an accounting regulatory authority, which, in applying "general accounting principles," discredits the Audit Report and reprimands its authors for, among other things, their failure to "accord with generally accepted auditing standards." *See* Deft. Appx. I, Ex. 17 at 5, 9 (Central Chamber of Commerce, Report of the Auditors' Board). The need to resolve conflicting applications of Finnish accounting principles is manifest.

As mentioned above, the issue of whether the Finnish Companies Act requires an independent audit of the value of the assets transferred to a subsidiary where the subscription of shares is qualified (i.e., "in kind," as opposed to being a cash capital increase), is hotly contested by the parties and vital to the resolution of this case. (Carnival alleges that no independent valuation of Marine's assets was ordered by the Defendants prior to the merger.) The parties submit competing and mutually exclusive affidavits of experts on Finnish law in support of their respective positions. In support of its argument that such an independent appraisal requirement exists as a matter of Finnish corporate law, Carnival offers the affidavit of Professor of Law of

the University of Tampere, Risto O. Nuolimaa. Defendants counter by arguing first, that such a cash infusion and transfer-back, rather than payment-in-kind, is "a common practice" in the formation of Finnish corporations. *See* Defendants' Appx. I, Ex. 16 at 6 (Decision of the Supervisory Bd. of the [Finnish] System of Auditors, trans.). Second, Defendants argue that even if Marine had been capitalized in-kind, Finnish law requires no such appraisal, again submitting the affidavit of Jukaa Luostarinen, the Finnish attorney, in support of this proposition. *See* Luostarinen Aff. ¶¶ 7, 8. Moreover, they conclude, even if such an independent appraisal were required, "Carnival cannot establish that an independent appraisal of the shipbuilding assets which Marine purchased from Wartsila and Valmet would have differed significantly—or even at all—from the values assigned to them in the purchase transaction." Wartsila Motion to Dismiss at 45.

Aside from the question of whether an appraisal was required in this particular case, where the parent companies allegedly transferred cash in and then immediately out of Marine, the parties have submitted contradictory affidavits on the question of whether the unanimous agreement of the shareholders (here, there were only two) obviates the appraisal requirement. Defendants have filed the affidavit of Pauli Armas Koski, professor of commercial law at the Turku School of Economics and Business Administration, who argues that the Finnish Companies Act (chapter 2 section 4) requires a report to be distributed only to shareholders, and that report does not require an independent audit. *See* Koski Aff. ¶ 22. Thus, "the shareholders of Wartsila Marine could unanimously agree to not provide to themselves the report referred to in the Companies Act...." *Id.* Further, Koski contends, the reporting provision is nonmandatory, and therefore the failure to comply would not void the merger. *See id.* at ¶ 23.

Not surprisingly, at least two of Carnival's experts disagree with this construction of Finnish corporate law, *see* Nuolimaa Aff. at ¶¶ 16–21; Liiri Supp. Aff. ¶ 17, re-

ferring to the legislative history of the Finnish Companies Act as proof that the reporting requirement is designed not only for stockholders, but also to inform "third parties, especially the creditors of the company." *See* Liiri Aff. Ex. B at 8 (Cabinet Proposal to the Parliament for a New General Corporation Law, No. 27/1977). One of Carnival's legal experts concludes that the rationale of the reporting requirement thus "requires that even unanimous consent of shareholders cannot dispense with these provisions." *See* Liiri Supp. Aff. ¶ 18. A decision about these competing interpretations of an important provision of the Finnish Companies Act must be reached by the judge hearing this case.

The questions of American law which a Finnish court might be required to resolve are not nearly so thorny. In the first place, it is not at all clear that American, as opposed to Finnish, piercing law would apply; even if the domestic piercing factors were controlling, *see e.g., United Steelworkers of America v. Connors Steel Co.,* 855 F.2d 1499, 1505 (11th Cir.1988), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989); *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 691–92 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986); *Jarax Int'l Inc. v. Capital Factors, Inc.,* 122 B.R. 793, 798 (S.D.Fla.1990), they turn on the application of Finnish corporate law. For example, whether a Finnish subsidiary is undercapitalized can only be determined fairly by applying Finnish accounting principles in light of Finnish corporate law, Finnish business conventions and Finnish commercial realities. Such a determination

without some valuation of the Finland-based assets of that corporation would be necessarily superficial. Further, deciding that American corporate formalities have or have not been observed by a Finnish corporation would have no bearing on whether that corporation properly respected Finnish principles of the corporate form. Moreover, it is far from certain that Finnish choice-of-law principles would select American standards for fraud as governing the action in Helsinki.

In sum, the balance of conveniences and the public interest factors strongly suggest that Finland would be a far more appropriate forum for this litigation.

### III.

Finally, although we need not reach the issue, we note that there is at least a fairly debatable question as to whether this Court has subject-matter and personal jurisdiction over Valmet. The lower courts are deeply split on the issue, with a Ninth Circuit Court of Appeals decision on point indicating that there would be no jurisdiction, *see Gregorian v. Izvestia,* 871 F.2d 1515, 1522 n. 4 (9th Cir.), *cert. denied,* 493 U.S. 891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989) and a recent Eleventh Circuit Court of Appeals opinion—although not directly on point—suggesting that there would be. *See Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1544 n. 13 (11th Cir.1993), *cert. denied,* —— U.S. ——, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993). Were Valmet immune from this lawsuit, even assuming that Wartsila were subject to personal jurisdiction,[7] a very

---

**7.** The assumption is a safe one, since Wartsila's jurisdictional protests must fail under a "committing a tortious act within this state" theory of specific personal jurisdiction. *See* Fla.Stat. § 48.193(1)(b). Assuming that Wartsila sent the comfort letter by facsimile from Helsinki to Miami—and for the purposes of this motion we assume this to be true, *see Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1988)—this act clearly subjects Wartsila to personal jurisdiction under the controlling decision in *Sun Bank, N.A. v. E.F. Hutton & Co.,* 926 F.2d 1030, 1033 (11th Cir.1991). Wartsila argues that *Sun Bank* was wrongly decided. It is, however, binding law in this Circuit. *Sun Bank* held that jurisdiction arising out of an over-the-phone fraudulent mis-

representation would pass Florida long-arm requirements but would *not* satisfy due process. In *Sun Bank*—unlike here—the *plaintiff* made the phonecall from Florida to the out-of-state defendant. As the Court explained, "[t]hat the calls originated from Florida rather than from Indiana or Idaho was purely a matter of chance." *Id.* at 1034. Further, the misrepresentation allegedly made by the defendant in *Sun Bank* (a stockbroker, who allegedly gave Sun Bank inflated figures about his client's securities account, on the basis of which Sun Bank extended credit to its future detriment) did not seek to initiate a "'continuing relationship[ ] or obligation.'" *Id.* at 1034 (quoting *Travelers*

heavy weight would be placed on the Finland side of the balance of conveniences.

 Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1601–1611, Valmet is considered a "foreign state," because it is 80% owned by the government of Finland. *See* 28 U.S.C. § 1603(b); *see e.g., Carey v. Nat. Oil Co.,* 592 F.2d 673, 676 n. 1 (2d Cir.1979). Consequently, Valmet's amenability to suit in the Courts of the United States is governed by the FSIA, which provides that foreign states are immune from the jurisdiction of the Courts of the United States and of the States unless a particular exception of the statute applies. *See* 28 U.S.C. § 1604. The district courts have subject-matter jurisdiction over any action against a foreign state where an exception to immunity applies, *see* 28 U.S.C. § 1330(a), and have long-arm personal jurisdiction over the sovereign defendants in those actions, provided that service has been made as prescribed by the FSIA, *see* 28 U.S.C. § 1330(b).

Under the FSIA, sovereigns are generally immune, subject to the exceptions contained in section 1605(a).[8] Subsection 1605(a)(5) permits suit against sovereigns for non-commercial torts resulting in death, personal injury, or property damage (e.g., ambassador's car kills a pedestrian). Subsection (a)(5) then reads: "except this paragraph shall not apply to ... (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, *misrepresentation,* deceit, or interference with contract rights...." 28 U.S.C. § 1605(a)(5)(B) (emph. supplied).

The crux of the sovereign immunity dispute boils down to this question: Does subparagraph 1605(a)(5)(B) mean that sovereigns are immune for *all* claims for misrepresentation, or just "non-commercial" misrepresentation? Carnival argues that (a)(5)(B) means that only "non-commercial" misrepresentation is immune; the statements in the comfort letter (and any others made during negotiations) were obviously commercial since they sought to induce a shipbuilding contract; therefore, Carnival concludes, Valmet would be subject to suit.

 Valmet contends, on the other hand, that it is very difficult to conceive of, for example, non-commercial "interference with contract rights," yet that tort is grouped together with misrepresentation and other torts which could conceivably be committed by a sovereign acting as a government, rather than as market-participant. Read Carnival's way, Valmet argues, the statute does not make sense. Consequently, the statute *means* that sovereigns are immune from suit on *all* of the torts listed in subparagraph (5)(B), regardless of whether they are commercial or non-commercial. Furthermore, the Federal Tort Claims Act provides that the United States is immune for the exact same list of torts in *any* context (i.e., no distinction made

*Health Ass'n v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)). Here, in stark contrast, the caller (or faxer, the difference being of little moment) *"purposefully directed"* the fax to Florida from outside of the forum, *Burger King v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (emph. added), seeking to induce an *ongoing contractual relationship* with a person inside Florida. Wartsila's alleged contacts with Florida were thus anything but "random" or "fortuitous." *Keeton v. Hustler Magazine,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 568, 62 L.Ed.2d 490 (1980).

**8.** The first exception to immunity permits jurisdiction for complaints concerning commercial activity with a "direct effect" in the United States. 28 U.S.C. § 1605(a)(2). Valmet argues that, even assuming that there was a misrepresentation, there was no "direct effect" in the United States. Given the significant losses of bookings Carnival alleges, Valmet's argument is not persuasive. *See Republic of Argentina v. Weltover,* —— U.S. ——, ——, 112 S.Ct. 2160, 2168, 119 L.Ed.2d 394 (1992) (breach of contract claim against Argentina for default on bonds designated for payment in New York alleged "direct effect" in the United States, rejecting "substantiality" and "foreseeability" requirements); *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d at 1545 (negligence claim against French automobile manufacturer for defective passenger restraint system properly alleged "direct effect" since effect followed " 'as an immediate consequence of the defendant's ... activity' ") (quoting *Weltover,* —— U.S. at ——, 112 S.Ct. at 2168).

between commercial/noncommercial): "malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." [9]

Valmet's arguments are precisely those made by the Ninth Circuit in *Gregorian*. *See Gregorian v. Izvestia,* 871 F.2d at 1522 n. 4. Carnival counters that the argument in *Gregorian* is dicta since the *Gregorian* court found that the alleged libel (by an article in the Soviet *Izvestia* ) was "governmental rather than commercial in nature" and therefore was immune right off the bat under section 1605(a)(2) (stating that *all* non-commercial activity is immune). This footnote in *Gregorian* was an alternate and supporting ground for the holding, however, and cannot be fairly cast as dicta. *See Gregorian,* 871 F.2d at 1522 n. 4 ("Nor could plaintiffs have established subject matter jurisdiction under section 1605(a)(5)."). In any event, *Gregorian* is not without its critics. *Cf. LeDonne v. Gulf Air, Inc.,* 700 F.Supp. 1400, 1410 (E.D.Va.1988) (disagreeing with *Gregorian* for two reasons: (1) "the statutory language flatly precludes the construction accepted in *Gregorian*"; and (2) "there is no explicit manifestation" in the legislative history of any intent of Congress to make the FTCA and the FSIA parallel with regard to this list of torts).

The authority on point does not provide any strongly persuasive rationale for disagreeing with *Gregorian,* except the "plain language" argument, which, because of the anomalous reading it results in, i.e., "non-commercial interference with contract rights," is not that convincing. *See Foremost–McKesson v. Iran,* 759 F.Supp. 855, 859 (D.D.C.1991) (stating that "[t]he clear language of the statute declares that section 1605(a)(5) does not apply to section 1605(a)(2)," but offering no other reasoning, and failing to address the anomaly).

For example, *Tifa Ltd. v. Republic of Ghana,* 692 F.Supp. 393, 404 (D.N.J.1988), reasoned that because section 1605(a)(5) "was directed primarily at traffic accidents," subsection (a)(5)(B) was not intended to restrict the scope of the commercial activity exception to immunity. Subsection

---

**9.** Under Federal Tort Claims Act ("FTCA"), the United States is immune from suits for deceit and misrepresentation. 28 U.S.C. § 2680(h) (as amended, 1974). This includes suits for wrongful inducement. *See United States v. Texarkana Trawlers,* 846 F.2d 297 (5th Cir.), *cert. denied* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988) (wrongful inducement to refinance mortgage notes based on alleged misrepresentations by National Marine Fisheries Service).

Valmet claims that the legislative history expressly designates that the FSIA list was meant to correspond to the FTCA list. *See* H.R.Rep. No. 1487, 84th Cong., 2d Sess., *reprinted in,* 1976 U.S.Code Cong. & Admin.News, 6604, 6620 ("The exceptions provided in subparagraphs (A) and (B) of section 1605(a)(5) correspond to many of the claims with respect to which the U.S. Government retains immunity under the Federal Tort Claims Act, 28 U.S.C. 2680(a) and (h)."). Read in context, the relevant language from the legislative history is just as ambiguous as the statute. In all fairness, although the FTCA comparison strongly suggests that Valmet is immune, the same cannot be said for the legislative history.

As to parallelism between the FTCA and the FSIA, we note the following law review commentary:

"Foreign sovereign immunity need not mirror domestic sovereign immunity. While the absence of a domestic sovereign immunity principle might cripple a state's ability to perform routine governmental functions, the lack of coextensive foreign sovereign immunity would not injure a foreign state to the same degree. Foreign states simply do not have the same massive exposure to liability as domestic governments because they necessarily have fewer contacts with the local [U.S.] citizens. Since the principle of equality should only require that countries in like situations be treated alike, limitations on foreign sovereign immunity more stringent than those on domestic sovereign immunity would not seriously jeopardize the principle of equality."

Adam C. Belsky, Merk Merva, and Naomi Roht–Arriaza, Comment, *Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law,* 75 Calif.L.Rev., 1849, 1857 n. 39 (1988). This statement, is somewhat impractical, however, since it asks only what the *damage* to other sovereigns would be relative to the *damage* that the U.S. would suffer in carrying out its discretionary functions. The counterargument is far more convincing: "[S]overeign immunity is based upon recognition of the sovereign equality of nations.... While it is possible to argue that the rationale for broad domestic immunity from such [tort] suits does not apply to foreign sovereign immunity, the appearance of less favorable treatment for foreign states would be undesirable." *Id.* at 1857.

(a)(5)*(B)*, however, has nothing to do with traffic accidents.

Other cases construing the statute against Valmet's position state their conclusion without much further explication. *See e.g., United Euram Corp. v. U.S.S.R.*, 461 F.Supp. 609, 612 (S.D.N.Y.1978) (citing without more, *Yessenin–Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 855 (S.D.N.Y.1978), which reads the statute without considering the problems presented by the list of torts in subsection (a)(5)(B)); *Foremost–McKesson, supra* (same).

Carnival cites *Chisholm & Co. v. Bank of Jamaica*, 643 F.Supp. 1393 (S.D.Fla. 1986) (Davis, J.) for the proposition that commercial misrepresentation claims have been subjected to jurisdiction under the FSIA. This is true, but *Chisholm* was decided solely on the basis of a determination that the claims were commercial and not sovereign in nature, without reaching a discussion of the exception clause. In *Chisholm*, an American company sued a Jamaican bank for breach of implied contract for failure to pay commissions to the plaintiff after plaintiff had arranged for credit insurance with Export–Import Bank of the United States. The question was whether these activities were commercial or sovereign in nature. The Court held that they were commercial and that the plaintiff could sue the Bank for breach of implied contract and for fraud. *Id.* at 1400–01, 1403–04. *Chisholm* did not construe the exception clause.

The recent decision by the Court of Appeals for the Eleventh Circuit in *Vermeulen v. Renault, supra,* did not consider the indeterminate problems of interpretation engendered by subsection (a)(5)(B). The Court of Appeals observed that the claim in *Vermeulen* clearly fell within the "commercial activity" exception to sovereign immunity, notwithstanding the fact that the plaintiff sought to recover for her personal injuries. Accordingly, the Court did not have to analyze the "non-commercial torts" exception to immunity in section 1605(a)(5) (providing that sovereigns may be sued for non-commercial torts resulting in personal injury, among other things). In support of its conclusion that Renault was not immune for a "commercial tort" which resulted in personal injury, the Court of Appeals cited to section 18 of the Restatement (Second) of the Foreign Relations Law of the United States, which provides for jurisdiction over foreign commercial conduct when the injury resulting therefrom is redressable by American tort law. Recovery for personal injury arising out of negligent design and manufacture was "unquestionably" permitted by American law. *See Vermeulen*, 985 F.2d at 1544 n. 13.

Thus on a very strict reading, *Vermeulen* never reached an analysis of the "non-commercial" torts exception clause in title 28 U.S.C. section 1605(a)(5)(B) which Valmet urges us to reach today. Accordingly, *Gregorian* would be the only other Circuit Court decision on point, and that case strongly suggests that we construe the FSIA alongside the FTCA and find that Valmet is immune from this lawsuit.

The decision in *Vermeulen*, however, need not be given a stilted reading. The more sensible view is that *Vermeulen* forecloses Valmet's interpretation of the statute and embraces Carnival's. That is, the statute first asks whether the activity is commercial (like selling cars or soliciting boat construction contracts) or "non-commercial" (like an article in a State-run newspaper, or a spy's killing of a U.S. national with a poison umbrella) in nature. If commercial, there is no immunity. If non-commercial and the plaintiff alleges injury to person or property, there is no immunity. Only if the activity is non-commercial need the plaintiff read further and beware that a foreign government may not be brought into an American Court for activity which resulted in the plaintiff's having been prosecuted, sued, maligned, deceived, or subjected to the loss of business.

## IV.

In sum, Finland is an adequate forum. Because the valuation of Marine's assets and liabilities cannot be correctly accomplished without the testimony of a host of

Finnish fact and expert witnesses, the private interests decidedly favor Finland. Moreover, the necessity of construing Finnish legal and accounting principles and of valuing Finland-based assets is glaring. The risk of an American court's getting them wrong is too great and a Finnish court will be far more adept at applying the law of its own forum, especially where it is already entertaining several lawsuits concerning the identical subject matter as Carnival's amended complaint. Although Carnival is entitled to deference with respect to litigating in this courthouse, even "an American citizen has no absolute right to sue in an American court." *Ionescu v. E.F. Hutton & Co.*, 465 F.Supp. 139, 145 (S.D.N.Y.1979).

> In an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation, they cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere.

*Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1450 (9th Cir.1990) (quoting *Mizokami Bros. of Ariz., Inc. v. Baychem Corp.*, 556 F.2d 975, 978 (9th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978)).

Accordingly, it is hereby

ORDERED AND ADJUDGED that

Metray Oy is substituted for Oy Wartsila Ab as party defendant, and

This cause is DISMISSED pursuant to the doctrine of *forum non conveniens.*

DONE AND ORDERED.